(No. 20231.—

THE POWERS STORAGE COMPANY, Plaintiff in Error, *vs.*
THE INDUSTRIAL COMMISSION *et al.*—(PETER BAL-
LAUER, Defendant in Error.)

*Opinion filed October 25, 1930.*

McKenna & Harris, (James J. McKenna, and Abraham W. Brussell, of counsel,) for plaintiff in error.

Joseph H. Hinshaw, for defendant in error.

Mr. Chief Justice Dunn delivered the opinion of the court:

The circuit court of Cook county confirmed an award of the Industrial Commission on account of an accidental injury in favor of Peter Ballauer of $3750, a pension of $25 a month for life and $81 for medical services, and the employer, the Powers Storage Company, prosecutes this writ of error to reverse the judgment of confirmation.

The occurrence which was the basis of the award happened on May 9, 1928, when Ballauer, while engaged in the work of his employer, suffered a stroke of paralysis. He fell on the cement floor of the room in which he was working, his head striking the floor. He was unable to rise. The only witness of the fall was Henry Mitzelfeld, who was working in the same room and called down the elevator shaft for help. Upon the elevator's coming up Ballauer was carried to it, brought down to the ground floor, and was then carried to an automobile and taken to a hospital. The questions argued are whether the fall caused the paralysis or the paralysis caused the fall; if the paralysis caused the fall, what caused the paralysis, and further questions in regard to objective evidence of the injury.

Ballauer began work for the plaintiff in error in 1924 moving furniture. On February 24, 1927, he was injured in the course of his employment while helping in the moving of a piano down some stairs, suffering a strain to his back in the lower lumbar region. As a result of that injury he was in a hospital for two weeks, following which he worked for about six weeks. After that he did not work for about a year. During about three months of that period he was treated by Dr. Beecher, and when he got rid of the

symptoms of lame back the doctor concluded he was "back to normal," though he still had some bad teeth which should have been removed. For the disability resulting from the injury received February 24, 1927, the defendant in error was paid compensation. He went back to work for the plaintiff in error on March 1, 1928, and worked that day, and afterward worked from April 18 to May 5. He was off from May 5 to May 9 because he did not feel well. On May 9 he weighed 165 pounds and was about thirty-eight years of age. He worked that morning with three other men moving pianos without mechanical aids. The first piano weighed between 700 and 800 pounds and was carried by the four men to the third floor, Ballauer carrying the heaviest corner. There was no window in the hallway at the top of the stairs, and Ballauer was out of breath, breathing heavily and felt weak, with all his strength gone. During the rest of the morning the four men moved five other pianos, one weighing 750 pounds, which was carried to the second floor of a flat-building. Ballauer in each instance carried the heavy corner of the piano. Moving these six pianos occupied the forenoon. Ballauer felt all right at dinner and ate a good, hearty meal at a place near the warehouse. When he returned to the warehouse he was told to go to the fourth floor to help Henry Mitzelfeld roll up rugs. He walked to the fourth floor and reported to Mitzelfeld, asking him where the rugs were. Mitzelfeld pointed them out lying against the wall, and Ballauer began to pick them up one at a time, stooping as he did so, and to carry them out on the cement floor and spread them out. He had done this with three or four rugs and went over to pick up another, when he had, as he expressed it, "a funny feeling all over" and fell down. On cross-examination he said that he was dizzy at the time he said he had a funny feeling. Things got black before him. He felt funny all over and then fell down. When he fell he bumped his head. He did not notice anything about his arm or leg before he

fell, but as soon as he fell he noticed that they were of no use. No mark was left on the defendant in error's forehead by reason of its striking the floor—at least no one testified that there was—and Dr. Inman testified that he found no discoloration or evidence of trauma in any respect. Ballauer had been in the room about ten minutes when he fell. Mitzelfeld testified that Ballauer did not handle any of the rugs but when he came into the room started to get the naphthalene pail, got it, and then began to stagger, fell on his side and worked himself toward the wall, calling, "Henry! Help me up! Get my leg up! I can get up if you help me with that leg." Mitzelfeld illustrated the character of Ballauer's fall, as stated in the abstract, thus: "I saw Pete fall. Just before he fell he was shaking, and then he keeled over. He went down sideways. He was standing about like this, [demonstrating,] and he got pale, and he started to go like this," [demonstrating by lying on the floor]. The arbitrator describes the witness' action by saying, "He shook and fell down, and he was still shaking when he fell down." The witness demonstrated again, saying: "The minute he came in he walked around like this, and he grabbed a pail and he looked funny, and he staggered like this, and he went along and he went down like this." He was asked by the arbitrator, "Did his head go against the wall?" and answered, "Yes, he was up against the wall." Dr. Beecher, at the request of the arbitrator, described the fall as follows: "I would say the witness described a slow falling, of a convulsive type." And Dr. Inman: "I describe it as convulsive staggering, which appeared as though he was losing control of his limbs, and more of a slumping than a fall; just a collapse; a falling as an article without any support; just a slumping down. He lit on his back and evidently he struck his head against the wall. From the description it would be the back of his head he struck, if anything." Dr. Beecher was Ballauer's witness and Inman plaintiff in error's.

The room was about 50 feet wide by 75 feet long and the windows were all closed. Ballauer testified that as soon as he went in he smelt naphthalene, which is a compound in flake or liquid form, used by sprinkling on the rugs as a moth preventive. The odor was there and a pail of the naphthalene was in the room. When Ballauer smelt the naphthalene "a funny feeling came over" him. Mitzelfeld testified that no naphthalene had been used there on that day. The fact that the paralysis affected the left side showed that the hemorrhage or thrombosis which caused the paralysis was on the right of the brain, and through neurological localization it was deduced that it was in the region of the internal capsule of the right side of the brain. There has been some improvement in Ballauer's condition, but he remains incapacitated for work and will probably always be so. He is married and has one child, who was seven months old when Ballauer testified.

It may be conceded that the fall and the bump on the head were not of such a character as would ordinarily have produced the hemiplegia from which Ballauer was suffering. Still it does not follow that the paralysis did not arise out of the defendant in error's employment. Three-fourths of the record in this case is taken up with the testimony of medical witnesses, and much more than three-fourths of that three-fourths consists of the answers of physicians to long hypothetical questions, framed with reference to presenting the case to the witness most strongly in accordance with the views of the respective counsel. The experts called by the plaintiff in error, in answer to the hypothetical question propounded by its counsel to them, answered that in their opinion there was no causal connection between the facts stated in the hypothetical question and the hemiplegia of the defendant in error. On the other hand, the experts called by the defendant in error, in answer to the questions propounded by his counsel, expressed the opinion that there could be a causal connection between the facts assumed in

the question and the subsequent paralysis. The facts were for the determination of the commission. It might give credit to Ballauer's account of what occurred in the room on the fourth floor rather than Mitzelfeld's. There was evidence to justify a finding that Ballauer had been doing hard, heavy and exhausting work during the forenoon; that he ate a substantial dinner and afterward climbed the stairs to the fourth story. He found the room was close, with all the windows closed, impregnated to some extent with naphthalene filling the air with the odor of moth balls. A feeling of dizziness came over him, whether caused by the naphthalene or not. He began to move the rugs. To do so he had to walk over to the rugs, stoop over, pick one up and straighten up. He did all this two or three times, and when he went to get another rug he bent over and went to pick it up, when he had a peculiar feeling and fell over.

The hearing before the arbitrator began on September 14, 1928. Dr. Beecher and Dr. Inman testified at that hearing. Each had seen Ballauer after his paralysis and made an examination of him, Inman at the warehouse on May 9 while he was still lying on the floor, and Beecher on May 12 at the Columbus Hospital. Beecher treated him at the hospital for a week after this examination. Besides testifying to their examination and observation each testified as an expert, giving his opinion as to the cause of the paralysis. These opinions were somewhat opposed, and the hypothetical questions put to the one and the other of them were somewhat different, because the respective counsel in asking them included in the hypothesis the view of the evidence most favorable to his own side. The witnesses agreed that the paralysis resulted from one of two conditions existing in the brain—a broken blood vessel, or a thrombosis, shutting off the blood from the part of the brain affected. No direct physical examination of the brain was possible.

A blow on the head may break a blood vessel in the brain, and where the blood vessels are weakened by disease, unusual exertion may result in sufficient increase in blood pressure to break a blood vessel. A break occasioned by unusual exertion may be expected at the peak of exertion rather than an hour or more after. Thrombosis occurs most frequently in blood vessels which are diseased, the passage through which is narrowed and the circulation thereby slowed up. This permits the formation of a blood clot, or a blood clot may form elsewhere and be carried in the blood stream to a blood vessel which is too narrow to permit its passage. In either case the circulation of the blood is obstructed and paralysis follows. There is no direct evidence in the case that Ballauer's blood vessels had been weakened by disease, but the inference may arise from the fact that either a hemorrhage or thrombosis occurred. It is unusual for either to occur in the case of a man of his age. It is not surprising that the doctors disagreed in their conclusions from the facts as stated to them in the various hypothetical questions. The occurrence was unusual, and they were called upon to explain, if they could, what caused the portion of the brain controlling Ballauer's left side to cease to act, and particularly what part, if any, the work which Ballauer was doing had in the event. It is not important, as affecting the plaintiff in error's liability, whether or not Ballauer's blood vessels had been weakened by disease and the rupture of the blood vessel might have occurred under ordinary circumstances without reference to his employment. His employer accepted him as an employee in the physical condition in which he was and is liable for any accidental injury occurring to him arising out of and in the course of his employment. (*Jones Foundry Co.* v. *Industrial Com.* 303 Ill. 410.) Death from a pre-existing disease aggravated or accelerated by an accidental injury is within the Workmen's Compensation law. Acceleration or aggravation of a pre-existing disease is an

injury caused by accident. *Peoria Terminal Co.* v. *Industrial Board,* 279 Ill. 352.

The work which Ballauer had been doing in the morning was his usual work, and while heavy and exhausting and of a kind to increase his blood pressure, yet was not likely to cause the rupture of a blood vessel in a healthy man of thirty-eight used to such work. The eating of a hearty meal and immediately afterward climbing four flights of stairs was not dangerous to such a man. The odor of naphthalene is the same as that of moth balls. Mitzelfeld testified that there was not enough of it to hurt anyone. The odor was there, however, and Ballauer noticed it. He moved and picked up several rugs, stooping to pick them up. The plaintiff in error contends that he was paralyzed when he fell. Dr. Beecher's opinion was that he was dizzy, that his fall was caused by dizziness, and the blow on his head produced the hemorrhage and the consequent paralysis. The odor of naphthalene was incident to the work as well as the stooping to lift the rugs. Stooping repeated a few times does not cause dizziness to a healthy person, but there are times when dizziness does follow stooping, perhaps from the greater flow of blood to the head, or, without any apparent cause, from some internal derangement of the stomach. Dr. Beecher, in giving his opinion that there was a causal connection between the facts shown and Ballauer's condition, stated that his opinion was that the man mentioned in the question became dizzy from the nature and circumstances under which he was working, fell, struck his head on the cement, and a cerebral hemorrhage resulted from the blow to his head; that the fall and the blow to the head could have occasioned the hemorrhage; that the fumes and the atmospheric conditions may have caused the dizziness; that stooping would tend to aggravate the tendency to dizziness by increasing the flow of blood to the head; that performing repeatedly unusually heavy tasks has a tendency to repeated engorgement of or strain on

the blood vessels and is especially apt to show wear on the vessels of the brain, the tone of such vessels is apt to be worn out quicker, and one performing such tasks is more apt to dizzy effects and other so-called functional effects under similar circumstances, perhaps, than an average individual. Dizziness may result from too much or too little blood in the brain.

Dr. Adams testified that his opinion was that there might or could be a causal relation between the set of circumstances and the subsequent condition of loss of strength and partial paralysis on the left side. As to the facts stated in the questions and taken into consideration in his answer, he referred to the man doing some pretty hard work, going into a room' which contained the vapors of naphthalene, either in solution or dry, stooping over to unroll rugs, the immediate onset of a vasomotor condition in the brain, followed by paralysis but without unconsciousness. He continued: "The act which you described and the inhalation of the naphthalene would be sufficient, in my mind, to produce a vasomotor spasm in the brain, so that he might fall as you described, and that as he came out of that condition, which was not sufficient to produce unconsciousness, the rebound of his circulation would favor the formation of hemorrhage, or a formation of a clot or thrombosis, and would be responsible for the paralysis on the left side of his body. As to the infected teeth, that would be evidence that the man was not well and was less resistant to strain and shock and the vicissitudes of his work. I think it is impossible to tell whether this was the result of a hemorrhage or a thrombosis. It may be both. Increased pressure of the cerebral vessels would tend to bring about a hemorrhage, and more particularly an exhaustion of the man through hard work would tend to bring about a vasomotor spasm in the base of the brain, which could result either in hemorrhage or thrombosis or both. I think the immediate effect of helping to carry six pianos in one morning would tend

to increase the blood pressure, and the ultimate effect would be exhaustion. The immediate effect of stooping over five or six times would bring about the effect of alternately filling and emptying the vessels, would be hazardous to a man of the type you mention, to the brain vessels. I would not say that bending over would cause the blood pressure to go as high as lifting pianos, but it would be analogous to lighter lifts." Upon cross-examination the doctor further enlarged on his answer, saying, among other things: "I took into consideration in answering the hypothetical question this bump that he got on the parietal region. I had in mind that this man had something go wrong with his blood vessels sufficient to disturb his stability, and he fell over. I don't think the bump did him any good, and I don't think the bump itself was the exact cause of the blood vessel disorder. I think the bump was a contributing cause to the hemiplegia. If the bump was the direct cause of the hemiplegia I would expect to find evidence of the fall. If it wasn't sufficient enough to cause evidence of the fall it could be only a contributing factor. I don't think you have any business in leaving it out of the hypothetical question. It is there. If there is no evidence of discoloration, abrasions, etc., I would still consider it a factor in bringing about the hemiplegia, but not a big factor. Of course, it arose out of a fracture on that side because the hemorrhage was on the right side, if this is the left side. That fact, standing alone, would indicate that it was only a contributing factor in bringing about the hemiplegia that followed. I would say it played only a minor part. If he fell upon a bundle of rugs and didn't fall on concrete and bump his head he might have got hemiplegia just the same, because that was one of the minor factors. * * * I wouldn't say he had the paralysis before the fall, but I would say he had a blood vessel spasm and had disturbance enough to make him fall."

Dr. Stevens, an expert witness produced by the plaintiff in error, thought it probable that thrombosis rather than hemorrhage was the cause of the paralysis and would not expect increased blood pressure to have a great deal of effect on thrombosis. He thought that whatever the man was doing probably played some part in the resulting condition that he suffered, if it was immediate and quick. The result was immediate and quick. Nothing in the immediate circumstances was of such a character as to forecast paralysis in one whose blood vessels were not impaired. The immediate circumstances, the odor of the naphthalene, the repeated stooping, were of a character to increase the danger, if danger did exist. The result proved that danger did exist. It is a reasonable conclusion that the work which the defendant in error was doing contributed to the result.

The testimony of Drs. Inman, Stevens, Scott and Swift is not in reality to the contrary. Dr. Inman testified: "I would say that a person who had suffered hemiplegia, assuming that he had no trauma to bring it upon him, was, before he suffered the hemiplegia, suffering from a weakened condition of the blood vessels in the brain. * * * I would recommend that such a person have rest and no excitement. * * * Any increase of pressure on blood vessels which were weakened to such an extent as to be in danger of hemiplegia would have a tendency to aggravate the condition. The danger of hemiplegia from trauma is greater to a person who is suffering from a weakened condition of the blood vessels than to a person who is not so suffering." Drs. Inman, Scott, Stevens and Swift believed that the fall resulted from the hemiplegia and there was no causal connection between the work the defendant in error was doing and the fall. Their testimony was based on the supposition that after entering the rug-room defendant in error had stooped but once, and that for the pail of naphthalene. The opinions of the doctors who testified for

the plaintiff in error assumed that the defendant in error had a pre-existing trouble which produced paralysis without intervening factor. That very assumption, accompanied by the admitted fact that work such as the defendant in error was engaged in would tend to increase the danger, brings the case, even on their theory, directly within the reason of the opinion in the case of *Jones Foundry Co.* v. *Industrial Com. supra.*

It is contended that the evidence, as a matter of law, shows that the employee failed to show objective symptoms of the injury, in compliance with the requirements of section 8, sub-section (*i*), clause 3, of the Workmen's Compensation act, (Smith's Stat. 1929, p. 1417,) which limit compensation for injuries to such injuries as are proved by competent evidence of which there are or have been objective conditions or symptoms proved not within the physical or mental control of the injured employee himself. It is said, first, that the objective symptoms required by this statute would be a microscopic examination of the brain itself, and that the paralysis is merely the result of the injury to the brain and is not an objective symptom of the injury. It is true that the injury was to the brain and the injury was not shown by an examination of the brain, but such an injury has a characteristic result, which was present in this case. This result was an objective symptom proving the injury. The second point under this head is that the symptoms shown by Ballauer were within his physical or mental control. This contention is based upon the fact that the motor functions of the left side, and not the sensory functions, were affected, and it is contended that the appearance of paralysis could be simulated. The paralysis in this case extended to the entire side, including the face, and is an objective symptom, though it might be possible for an exceptional individual to simulate it. There is no evidence in this case that it may be simulated or that tends to show simulation by the defendant in error.

It is contended that the defendant in error is not entitled to an award for permanent total disability; that the only conceivable basis for an award would be for an aggravation of a pre-existing disease. This is not a case of the acceleration or aggravation of a previous disease but is a case of an accidental injury to which the physical condition of the workman predisposed him, the result of which was to produce total disability, for which the statute provides compensation. '

It is contended that the arbitrator erred in permitting Dr. Beecher to testify to a conversation with John J. Powers, the president of the plaintiff in error, in which he told Powers that the defendant in error was paralyzed, and gave the history of having become dizzy and having fallen and struck his head on the cement floor while he was at work. The testimony was incompetent to prove the facts stated, but the facts were testified to at the hearing by the defendant in error, and the evidence objected to was proper to show notice to the plaintiff in error. *Valier Coal Co.* v. *Industrial Com.* 320 Ill. 69.

The second complaint is that the arbitrator erred in refusing to strike out the conclusion of Dr. Beecher that the hemiplegia of the plaintiff in error was traumatic and not idiopathic, because such conclusion was based on both objective and subjective complaints. The doctor had testified that in reaching his conclusion he had taken into consideration both the history of the case and what he had actually found in his examination. The cases cited in support of the point are *Wells Bros. Co.* v. *Industrial Com.* 306 Ill. 191, and *Lehigh Stone Co.* v. *Industrial Com.* 315 id. 431. In both those cases it was held incompetent for a doctor who examines a party for the purpose of testifying, to base his conclusions in part upon subjective symptoms or the history of the case as given by the employee and in part upon objective symptoms. The rule is different where the examination of the patient is by the doctor in attendance upon

him for the purpose of treatment, only. *City of Chicago v. McNally*, 227 Ill. 14.

It is contended that the commission erred in sustaining an objection to testimony of Powers offered to show that Dr. Beecher had said to Powers that he had called up the insurance company and they were not liable for a stroke. The objection was properly sustained to the testimony, for it was immaterial what Dr. Beecher or the insurance company thought about the matter.

The judgment of the circuit court will be affirmed.

*Judgment affirmed.*