(No. 4434— ▮▮▮▮▮

JULIA ANNA MEYERS, WIDOW, ET AL, Claimant, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed April 14, 1952.*

HARRY L. PETERS AND WILLIAM A. REDMOND, Attorneys for Claimant.

IVAN A. ELLIOTT, Attorney General; WILLIAM H. SUMPTER, Assistant Attorney General, for Respondent.

SCHUMAN, C. J.

Julia Anna Meyers, widow of Harvey C. Meyers, seeks to recover under the Workmen's Compensation Act for the death of her husband, allegedly as a result of a coronary thrombosis suffered by decedent on February 7, 1951, while he was employed as Chief of Fiscal and Office Administration, Illinois State Employment Service, Division of Unemployment Compensation for the Department of Labor.

Decedent had been employed by the State of Illinois since 1933, and his earnings for the year preceding his death were $7,992.00. He had no children under 18 years of age at the time of his death, and the oldest child was 28 years of age. No jurisdictional questions are raised. At the time of his death he lived with his wife, and two children, namely, Dolores, aged 21, and Charles, aged 19.

The claim is predicated on the ground that decedent died of a coronary thrombosis caused by the great strain and pressure of his duties, and apparently based

on the ground that the strain and stress covered a long period of time. Julia Anna Meyers, decedent's widow, testified that on the Friday and Monday immediately preceding decedent's death he stayed at home on account of illness, which might have been a touch of the flu; that he worked on Tuesday, the day before his death, but came home tired that day; and, that he generally came home in a tired condition. She further testified that decedent was in good health, outside of the attack of flu, which had kept him home the Monday and Friday prior to his death. He had had a physical examination, and she knew of no previous heart condition.

On February 7; 1951, he reported for duty at the Unemployment Compensation Office at about 8:20 A.M. (He lived in Glen Ellyn, Illinois, and there is no direct testimony as to how he travelled from his home to the office on that day, but he usually and customarily took the train to the Northwestern Railroad Station, and walked from there to the Merchandise Mart.) Decedent was seen walking down the aisle and entering his office by B. Robert Bobisud, one of the department heads, who occupied the adjoining office, at about 8:20 A.M. A few minutes thereafter Neely W. Keith, an employee in the office, entered decedent's office, took a seat at his desk, and talked with him for about twenty minutes. Then Mr. Keith had a telephone call, and went to answer it in his office. After talking on the phone about five minutes, he heard decedent call him. Mr. Keith cut short his telephone conversation, and re-entered decedent's office. At that time, Mr. Bobisud was there, too, and decedent was still sitting at his desk. B. Robert Bobisud testified that decedent, as he was sitting at his desk, was perspiring on his forehead,

and had pallor of skin and face. He asked decedent what was wrong, and decedent answered, "I got a pain across my chest." He then took a handkerchief and wiped his forehead, and called a nurse. Mary Keenan, a registered nurse, entered decedent's office about 8:45 A.M. She testified he was sitting at his desk, and had a pain in the cardiac region; that his pulse was about 70; that he had cold perspiration, and was pale; that she removed his tie and belt, and had a cot put in decedent's office, so that he might lie down. Dr. Smith at this time examined decedent, took his blood pressure, and administered a hypodermic. Then Dr. W. F. Ferris, a general practitioner in the building, who had been called, arrived at decedent's office, and attended him between 9:15 and 9:30 A.M.

Dr. W. F. Ferris testified decedent was lying there in his office in severe pain; that he was pale and breathing rapidly, pulse was weak and rapid; and, that decedent complained of severe pain in his left chest, and perspiration with cold clammy sweat. He was conscious until his death at 10:00 A.M. A pulmotor squad was called, and came to his assistance, but failed to revive him.

Dr. Ferris further testified that he had never seen decedent before, and attended him as an emergency physician; that he diagnosed the cause of death as coronary thrombosis, which he defined to be the result of a condition affecting the coronary arterial system, meaning the muscles of the heart, and a trauma, which occurs in the muscle wall of the coronary arteries, causing a blood clot. He further testified that that is where decedent had the coronary thrombosis, and his condition was his circulation to the arteries with the

resulting symptoms of severe pain and pallor, and a clammy skin condition.

John F. McCarthy, an employee of the Division of Unemployment Compensation in charge of investigations regarding personnel and the unemployment compensation program, testified as to a certain investigation made by him in connection with said Department, which occurred about a year and a half before decedent's death. Alfred C. Sorenson, property consultant, employed by the Unemployment Compensation Division of the Department of Labor, testified as to problems connected with locating leases, space locations for various offices, the control of property and equipment, and the operation and maintenance of equipment used in furnishing these offices. B. Robert Bobisud, Supervisor of Budget and Cost Accounting, Unemployment Compensation and Employment Service Division of the Department of Labor, testified as to the operations of that Department, and stated that the decedent did not appear to be working under any nervous tension, stress or strain. Neely N. Keith, accountant in the Fiscal and Office Administration Section of the Unemployment Compensation and Employment Service Division of the Department of Labor, testified as to the accounting problems of this Section, and also with reference to some correspondence had by decedent through his superior, Commissioner Samuel C. Bernstein, with the International Business Machines Corporation relative to changing the older equipment used in the office for newer and more modern equipment. At this time the payroll division was using I.B.M. machines. Milton Radice, present Chief of the Fiscal and Office Administration, Unemployment Compensation and Employment Service, Division of the

Department of Labor, and successor to the position held by decedent at the time of his death, testified as to the duties of the office; i. e., that the hours are from 8:30 A.M. to 4:30 P.M.; his duties, and that of his predecessor, the decedent, were to provide for all office services and duplicating facilities; supervise the mail room, mimeograph service, et cetera; to be responsible for purchases, leasing space, State budgets, and the administration of funds of major State agencies, which amounted to approximately eight to eleven million dollars a year; to be responsible for general accounting, as well as the accounting for all expenditures and receipts of funds for administration purposes. There were between 125 and 150 people employed in the office over which decedent had supervision.

From the testimony of the above witnesses and Samuel C. Bernstein, Commissioner of Placement for the Unemployment Commission, it appears that decedent was a conscientious, energetic, diligent and efficient executive; that he approached his duties very seriously, was concerned with all details of the various departments or sections, and was in close touch with his subordinates concerning same; that he was a normal individual, but at times excitable and upset in the course of his duties during frustration and difficulties, and became excited on minor issues.

From an examination of the record it is shown that decedent was a highly efficient administrator, who became nervous and excited over various problems confronting him. This, the claimant contends, caused stress and strain, which brought about the heart attack.

The question for the Court to determine is whether decedent's death was caused by an accidental injury arising out of and in the course of his employment.

This brings about the additional question as to whether the work decedent was doing at the time of his attack, caused, or contributed to the cause of his collapse and death.

There is no evidence in the record of any unusual occurrence on the morning that decedent suffered the attack. On the contrary, he had just arrived at work, and was sitting in his office, apparently not doing any work when the incident occurred. There is no evidence of an "accidental injury" on the morning in question, which would have caused the attack. The mere fact that deceased was at his desk in his place of employment would not constitute an "accidental injury".

In *Marsh* vs. *Ind. Com.*, 386 Ill. 11, the Court, on page 14, quoted as follows:

"In *Matthiessen & Hegeler Zinc Co.* vs. *Industrial Board*, 284 Ill. 378, where a fireman in a smelting plant became sick and died from breathing fumes, it was held this constituted an accident entitling recovery under the Workmen's Compensation Act. Accidental injury was defined as such as is 'traceable to a definite time, place, and cause, and the injury occurs in the course of the employment, the injury is accidental within the meaning of the Act'."

In *Town of Cicero* vs. *Ind. Com.*, 404 Ill. 487, the Court held:

"We have often held that the award of the Commission must be based upon something more than surmise and conjecture, and it must be shown by competent evidence, not only that the deceased sustained an accidental injury resulting in death, but that such injury arose out of and in the course of the employment. . . . . . . It is a well-settled rule that where an employee, in the performance of his duties, and, as a result thereof, is suddenly disabled, an accidental injury is sustained even though the result would not have been obtained had the employee been in normal health. (*Marsh* vs. *Ind. Com.*, 386 Ill. 11; *Carson-Payson Co.* vs. *Ind. Com.*, 340 Ill. 632; *Powers Storage Co.* vs. *Ind. Com.*, 340 Ill. 498; *Jones Foundry and Machine Co.* vs. *Ind. Com.*, 303 Ill. 410; *Baggot Co.* vs. *Ind. Com.*, 290 Ill. 530.)"

The cases of *Town of Cicero* vs. *Ind. Com.*, *supra*, *Fittro* vs. *Ind. Com.*, 377 Ill. 532, *Marsh* vs. *Ind. Com.*, *supra*, involved cases of physical exertion while engaged in the performance of their duties.

It is apparent from a reading of these cases that decedent must sustain an accidental injury traceable to a definite time, place and cause. The record in this case is based on facts showing emotional strain, frustration and excitement over a long period of time.

Dr. W. T. Ferris testified that he was a general practitioner and not an expert; that in his opinion decedent came to his death as a result of a coronary thrombosis, which is associated with individuals of the executive type, and also dietary; that he could not give an opinion as to decedent because he was not acquainted with him; that he could not give a positive statement, but added that the work of a person, employed in an executive capacity, shouldering a series of responsibilities, and subjected to pressure in the way of frustration, could be a contributing cause; and, that he would have to know more about the decedent than he did in order to say that tension would be a contributing factor.

The Court concludes that there is no evidence in the record that the work the decedent was doing at the time of the attack caused, or contributed to the cause of his collapse and death. There is no evidence of an "accidental injury" traceable to a definite time, place and cause, but the evidence is based on a series of events prior to the heart attack sustained on February 7, 1951.

In the case of *LeTourneau, Inc.* vs. *Ind. Com.*, 396 Ill. 435, the Court held at page 438:

"It is to be noted that in the instant case the medical testimony all introduced on behalf of the claimant was to the effect that there are several causes contributing to a detached retina. There is no testimony in the record that the work performed by the claimant caused the injury. The testifying physician stated only that strain could cause the detached retina, and we are left to infer that the strain testified to by the claimant was the cause of his injury. The case is similar in this respect to the situation in *Sanitary District of Chicago* vs. *Ind. Com.*, 343 Ill. 236. In that case the medical testimony was to the effect that there might or could be a direct

causal connection between the accident and the condition described in a hypothetical question. Citing, with approval, *Sears Roebuck and Co.* vs. *Ind. Com.*, 334 Ill. 246, we said: 'It is very clear from the testimony of all the doctors that in concluding that there was causative relation of the accidental injury to the death the witnesses were considering the mere possibilities.' The same situation applies here. The medical testimony in his record leaves the cause of the injury to pure conjecture."

The medical testimony in this case is based on possibilities, and leaves the cause of death to pure conjecture.

For the reasons assigned, the claim is denied.

William J. Cleary and Co. was employed to take and transcribe the evidence before Commissioner Anderson, and a charge of $155.40 was incurred for such services, which is reasonable and customary. An award for such amount is hereby entered in favor of William J. Cleary and Co., and is payable forthwith.