(No. 19328

SEARS, ROEBUCK & Co., Plaintiff in Error, *vs.* THE INDUS-
TRIAL COMMISSION *et al.*—(JIMMIE SMITH, Defendant
in Error.)

*Opinion filed February 20, 1929—Rehearing denied April 9, 1929.*

ADLER, LEDERER & KAHN, for plaintiff in error.

TEMPLE, BROWN, HAREWOOD & WIMBISH, (WILLIAM
H. TEMPLE, of counsel,) for defendant in error.

Mr. JUSTICE DUNN delivered the opinion of the court:

A writ of error was allowed on the petition of Sears,
Roebuck & Co. to review a judgment of the circuit court
of Cook county which confirmed an award of compensa-
tion by the Industrial Commission for the death of Freddie
Smith in favor of his widow, Jimmie Smith, against plain-
tiff in error, his employer.

Smith was in the employ of Sears, Roebuck & Co. as a porter, and it is claimed that on September 17, 1925, about 7:20 o'clock in the morning, while carrying two pails of ice down-stairs, his foot slipped and he fell down about three steps, striking his back on the steps as he fell. There was no witness to the occurrence. His wife, the claimant, testified that he came home from work that evening about five o'clock. On the lower part of his back was a fresh scar, the skin was knocked off, the place appeared to be bruised. It was on the lower part of his back, which Dr. Beasley testified was the lumbo-sacral region. He was confined to his bed the next two days, returned to work on Monday, the 21st, and worked until the 25th. After that he was off work until October 25, and worked from October 25 to November 13, was off work from November 13 to December 29, worked from December 29 to January 20, and did not work thereafter. He was sick all the time from September 17. His wife and his mother treated his back by rubbing it and applying liniment. He was taken to a hospital on February 2 in an unconscious condition, and died from tuberculous meningitis on February 6. He was a negro, thirty-three years old, weighing in health about 165 pounds. His wife testified that in February he appeared to weigh less than previously.

Dr. Evans, a roentgenologist at the Washington Boulevard Hospital, testified that he took two X-ray pictures on September 24, 1925, showing the lumbar spine and pelvis and the upper fifth of each femur of Smith. These pictures showed no injury or disease of the bone.

To show the causative connection between the fall and the tuberculous meningitis of which Smith died, Harold N. Rosenbloom, who was not a licensed physician but was an interne at the Cook County Hospital, was called as a witness for the petitioner, and testified that he examined Smith when he was brought to the hospital on February 2, 1926, where he died four days later. When objection was made

to his testifying because he had not qualified as an expert, the claimant's attorney said that he was not testifying as an expert but he could testify to his findings, and the arbitrator stated he might go ahead. He testified that when Smith was brought in he was in a condition of stupor, his neck was absolutely stiff, his temperature was 100.6, pulse 72, respiration 26, blood pressure 108 systolic and 68 diastolic. The head was sensitive, negative except for marked sordes, teeth were bad, there was decreased resonance over both apexes of the lungs. He had positive Kernig and Brudzinski reflexes. His white blood count was 5000. The spinal fluid was under increased pressure. It was clear the Pandy test was strongly positive, and there was a cell count of 75 per cubic millimeter. The left epididymis was enlarged and soft. The Pandy test is a microscopic test to determine the globular content of the spinal fluid, and it showed an inflammatory re-action, which might exist from various diseases. Rosenbloom made a diagnosis of tuberculous meningitis, which is an inflammation of the meninges—the membranes covering the brain and spinal cord. On cross-examination he gave an account, in great detail, of the manner in which he conducted the examination and the tests and processes he used to eliminate various diseases as causes of Smith's condition, by which he finally reduced the number to two which might be suspected—syphilis and tuberculosis. He then used the Wasserman test on the spinal fluid and on the blood, and it showed negative for syphilis and did not show positive for tuberculosis. This reduced the case to the one disease of tuberculosis, and he did not remember doing anything more to confirm that diagnosis. He testified further that tuberculous meningitis does not originate of itself but results from a primary tubercular infection or focus somewhere in the body where a tuberculosis germ is released into the blood stream and so carried to the meninges; that he made a complete examination of Smith and found two possible sources of infection: One

was in the lungs and suggested by their decreased resonance over the apexes, and the other was in the left epididymis, suggested by its enlarged and softened condition. That either was the place of origin was only suggestive and not positive. The examination he made suggested the conclusion that the source of infection was the epididymis and probably the seat of the primary focus of the disease, the decreased resonance of the lungs being of negligible value. He testified further that to verify findings with reference to the primary focus he made examinations similar to those previously made. They all led to the same conclusions. They all suggested that the primary focus was in the left epididymis. It is possible, and very common, for a germ to lodge in the canal leading from the epididymis and to travel through the blood stream and get into the brain. If there were tuberculosis germs in the canal leading from the left epididymis those germs may flow through the blood stream and lodge in the brain. The lodging of such a tuberculosis germ in the brain then might cause tuberculous meningitis.

Two physicians were called by the defendant in error and testified as experts in response to a hypothetical question embodying the facts as they appeared and the tests and deductions made by Rosenbloom. Each expressed the opinion that the injury on September 17, 1925, had something to do with the death. Dr. Nathaniel Green testified: "My opinion is that the injury had something to do with the man's death. I predicate my answer upon the facts that the injury to the man's back as you have described caused a lowered resistance in that region and set up favorable conditions for the growth of tubercular bacilli, and that in turn caused the tubercular meningitis. * * * The lowered resistance of any part of the body will have an effect upon the whole body, because the body works together as a whole and if any part is out of commission it impairs the function of the whole. * * * The lowered resistance and

favorable conditions of the growth in that region allows it to go to other parts of the body and set it up. * * * The alleged injury described in the hypothetical question might have had something to do with the cause of the death of the hypothetical person." In the opinion of this witness the tubercular germ might have entered at the point in the back where the skin was broken as the result of the accident.

Dr. E. W. Beasley testified: "My opinion is that there is a direct relationship between the injury sustained in September and the cause of his [Smith's] death. The reason for my opinion is that trauma, such as a lick to the head, to the chest or joints or long bones, may cause a local tuberculosis. That is, a crushing or injury to any one part gives a good media * * * for the growth of the tuberculosis. My opinion is that there was a tuberculosis which may have been present at the point injured; that the trauma to this part aggravated this lesion, which caused a dissemination of the tuberculosis, which finally caused the death by tuberculous meningitis. * * * My opinion is that it [the injury] caused a lowered local resistance."

Neither of the above doctors thought that the enlarged and softened condition of the left epididymis had any bearing on the question. The effect of the testimony of these doctors was, that to reach a conclusion they assumed that the injury resulted in a lowered resistance to disease, permitting a germ of tuberculosis to enter, or at least become active, at the point of injury and be carried thence to the meninges. There was no evidence of tuberculosis at the point of injury, and for that reason the testimony of the doctors had no value. These two doctors, who testified as experts, had not had long experience. The hearing at which they testified was in June, 1926. Dr. Beasley had received his permanent license to practice medicine in June, 1923. He was an interne at the Cook County Hospital for eighteen months and has been practicing general medicine since January, 1924. He tes-

tified that during his time at the hospital and his practice he had had occasion to see "many cases of tuberculosis, many cases of meningitis and many cases of tuberculous meningitis." Dr. Green testified that he received his license to practice in 1922 and had been engaged in the practice of medicine as a physician and surgeon since. He was an interne at the Provident Hospital, in Chicago, a year immediately after leaving school. During that time he had occasion to see cases pertaining to meningitis, cases wherein tuberculosis was involved and cases of tuberculous meningitis, and had seen many of them. Their testimony was not sufficient to justify a conclusion by the commission that the death of Smith resulted from the accidental injury which he received September 17, 1925. There was merely a possibility that the injury resulted in lowered resistance, locally, to germs of tuberculosis which may have existed in the lungs, the left epididymis or elsewhere, or that such germs may have found entry at the point of injury. The award, therefore, had no basis in the evidence.

On the other hand, the plaintiff in error produced Dr. E. R. LeCount before the arbitrator and Dr. Josiah J. Moore before the commission, who also testified as expert witnesses. Dr. LeCount has been a teacher at Rush Medical College for thirty-five years. As to his qualification as an expert he testified that after graduation from that school he studied in Johns Hopkins University, the University of Berlin, Germany, the Pasteur Institute in Paris, and in other places in Europe for shorter periods, and that he had been on the staffs, as pathologist, of St. Luke's Hospital, Presbyterian Hospital and Cook County Hospital, in Chicago, for many years. He is a teacher of pathology, having specialized in it ever since he graduated, in 1892. He is a member of the American Medical Association, Chicago Medical Society, Illinois State Society, American Association of Pathologists, American Association for Cancer Research, American As-

sociation for the Advancement of Science, and Chicago Pathological Society. In answer to a hypothetical question stating the facts and the conclusions of Rosenbloom he testified: "My opinion is that the facts as related do not contain any evidence of a causal relation between the injury and the death by tuberculous meningitis. Tuberculous meningitis never has its primary focus in the lower part of the spinal cord [referring to the lumbo-sacral region.] The cord is sometimes involved in tuberculosis in that region but incidental to tuberculosis of other extremities there. Tuberculous meningitis can have its primary focus in the lumbo-sacral region." He was asked, "In your opinion may a blow to the lumbo-sacral region, such as a fall as the hypothetical person in the question stated had, in your opinion cause tuberculous meningitis?" and answered: "Well, I will have to explain it. I cannot say yes or no to a question like that very well. This tuberculous meningitis—and that is, by the way, spelled tuberculous—is an infection of the membrane of the brain by the germs that are carried there by the blood. They can get into the blood most anywhere in the body where there happens to be tuberculosis, so that if you have tuberculosis of the spine and the germs are set free from that place, usually they will get into the blood stream there. It is not common, though, from the spine, and I don't know of its occurring at all from the spinal cord. I have never known of a case in which the focus of the tuberculous meningitis appeared in the lumbo-sacral region following a blow to that part. * * * The primary focus is practically always in the lungs and the glands at the right of the lungs,—that is, the first infection of tuberculosis is practically always by inhalation. There are some infections where the germ enters by the bowel, but they are very exceptional,—so exceptional that there are only perhaps fifty or sixty definite cases on record where the infections have taken place, usually where a child is born with tuberculosis from the mother. Certainly over

ninety per cent of the first foci are, as I have stated, by inhalation in the lungs—into the air passages. From there, of course, many places in the body get infected, and sometimes they are called primary, such as, for example, primary tuberculosis of the kidneys. That is an expression that you hear now and then. It is never primary in the kidneys. The infection is carried to the kidneys from somewhere else in the body. * * * An area of tuberculosis will develop in any part of the body following trauma, assuming that there is a primary focus somewhere else in the body. The place where it develops is almost invariably bones—severe trauma to bones. Assuming a trauma received by a hypothetical person who previous to the trauma had been in good health, the traumatism, such as was described in the hypothetical question, would cause a lower resistance to taking of germ disease in reference to the part where the trauma came in contact. That is exactly the way in which we use that term 'lowered resistance.' It is not to the body as a whole—it is at that place—and I have answered that in connection with the disposition of bones to become tuberculous after trauma when there is tuberculosis in the body."

Dr. Moore has been a physician since 1912, practicing the specialty of pathology and licensed as a physician in this State. He was graduated from Rush Medical College, and is the director of the National Pathological Laboratory, pathologist for the Ravenswood Hospital, consulting pathologist for St. Bernard Hospital, at Englewood, the Veterans' Bureau, T. B. Hospital at Dwight, St. Mary's Hospital at Kankakee and Mercy Hospital at Iowa City, Iowa. He has made a special study of pathology, has been teaching and working in it since 1909 at the Rush Medical College, the University of Chicago and the University of Illinois. He is a member of the American Medical Association, Illinois Medical Association, Chicago Medical Society, American Association of Pathologists and Bacteriologists, American Society of Clinical Pathologists, Institute of

Medicine at Chicago, Chicago Pathological Society, American Society for the Advancement of Science, and Illinois Laboratory Association. He has been associated with the National Pathological Laboratories for five years this time and two years during the World War and is a director of the National Pathological Laboratory. During the World War he taught at the University of Illinois and taught doctors at the Great Lakes Naval Training School. He testified in answer to the hypothetical question that in his opinion there was no causal connection between the injury and the tuberculous meningitis; that "tuberculous meningitis never has its primary focus in the lower part of the spinal cord. A blow to the lumbo-sacral region, such as a fall the hypothetical person in the above statement had, would not, in my opinion, cause tuberculous meningitis. Have never known of a case of tuberculous meningitis in which the focus of infection appeared in the lumbo-sacral region following a blow to that part. The disease known as tuberculous meningitis is more common in the winter months than at any other time in the year. The only explanation that I might have for that is, that at that time people are more susceptible to colds and that their general resistance is lowered. With the lowered resistance it is apt to affect the meninges."

It is very clear from the testimony of all the doctors that in concluding that there was a causative relation of the accidental injury to the death the witnesses were considering mere possibilities. While it is the province of the Industrial Commission to draw reasonable inferences from the evidence, an award under the Compensation act cannot rest upon conjecture or surmise or upon the choice between two views equally compatible with the evidence. The burden is on the claimant to show by a preponderance of evidence not only an accidental injury received but that the loss complained of was caused by the injury. In this respect the case of the claimant fails. The doctors agree that

tuberculous meningitis does not originate of itself but results from a primary infection or focus in some part of the body, from which a tuberculosis germ enters the blood stream and is carried to the meninges, and that traumatism by reason of a violent blow causing a crushing injury in any part of the body might cause in the injured part a lower resistance to the development of tuberculosis, which is a germ disease, if there were germs of tuberculosis in the body. The injured part would be more subject to the attack of tuberculosis germs and would furnish a better field for their development and growth. If the disease did attack the injured part the germs might get into the blood stream and reach the meninges and cause tuberculous meningitis. On this theory it was necessary for the claimant to show the existence of tuberculosis germs at the place of injury. There is no evidence of tuberculosis at the seat of the injury to Smith, in the spine, or in the lumbo-sacral region. The X-ray pictures showed no injury to the bone and no disease. So far as appears from the evidence the injury to the back was superficial, consisting of a bruised place where the skin was knocked off. His wife rubbed his back with liniment. He worked a few days at a time until January 20, and no other treatment seems to have been thought necessary. However favorable a field for the entry and growth of tuberculosis bacilli the injured back may have been, there is no evidence of the presence of them. The tuberculous meningitis must have originated from tuberculosis germs in some part of the body, but the evidence does not show that they came, or could have come, from the bruised back, and the burden of showing this was on the claimant. In the testimony of Rosenbloom two other sources of infection are suggested—the lungs and the epididymis. Tuberculosis originating from either of these sources was not caused by the accident. The evidence of the expert witnesses is that the primary focus of tuberculosis is practically always in the lungs and in the glands

256

at the right of the lungs,—that is, the first infection of tuberculosis is practically always by inhalation into the air passages, from which many places in the body may become infected. There is no evidence of lowered resistance of the body as a whole caused by the fall. Rosenbloom testified that on February 2, four months after the accident, Smith was under-nourished, and Mrs. Smith testified that at the same date he appeared to be smaller than he was and weighed less than he had before. There is no evidence that the condition of under-nourishment was the result of the fall.

The finding of the arbitrator that the injuries sustained by the deceased caused his death, and of the commission that this finding is correct, are without support in the evidence. The judgment of the circuit court is therefore reversed and the award set aside.

*Judgment reversed and award set aside.*