(No. 21678.—

WALTER O. RITTLER, Admr., Defendant in Error, *vs.* THE INDUSTRIAL COMMISSION *et al.*—(THE ILLINOIS POWER AND LIGHT CORPORATION, Plaintiff in Error.)

*Opinion filed February 23, 1933.*

JOHN E. WALL, and E. BENTLEY HAMILTON, for plain·
tiff in error.

LANCASTER & NICHOLS, for defendant in error.

Mr. JUSTICE DUNN delivered the opinion of the court:

This writ of error is prosecuted to review the judgment
of the circuit court of Adams county in the matter of an
application for compensation under the Workmen's Com-
pensation act for the death of Charles L. Spalding, who,
while in the employ of the plaintiff in error, the Illinois
Power and Light Corporation, on January 31, 1925, re-
ceived an injury. The defendant in error, Walter O. Rit-
tler, was appointed his conservator on October 12, 1927, and
on November 12, 1927, filed an application with the In-
dustrial Commission for compensation for the injury. The
application was heard by an arbitrator on February 15, 1928.
Spalding died on February 26, and on March 19, 1928, the
arbitrator made an award of compensation for total dis-
ability. A petition for review was filed, and on February
9, 1929, the conservator, as administrator *ex-officio,* filed
an application for compensation on account of Spalding's
death. The arbitrator made an award on this petition, a
petition for review was filed, and the two petitions for re-

view were consolidated by agreement and were heard together by the Industrial Commission, which set aside the awards and entered an order finding that Spalding's death was not caused by the injury and that he had not sustained any disability in his lifetime for which he was entitled to compensation. Upon a writ of *certiorari* the circuit court set aside the order of the commission and entered an award in favor of Spalding's administrator for the benefit of the estate of Cecelia Spalding, who had died during the pendency of the proceedings. Upon the petition of the employer it was awarded a writ of error to bring the record before us.

Spalding was employed by the plaintiff in error as a blacksmith in general car repairing. He was about fifty-eight years old. No one saw the accident which befell him on January 31, 1925. He was working by himself at the time, hanging or tightening bearings on the axle of a street car, using a wrench. He was in a pit doing this work, standing with his feet on the bottom of the pit while the axle on which he was working was over the pit and above him. The bottom of the pit was of rough concrete and the sides of brick. Though nobody saw it he must have fallen, for he was found in the pit, in a somewhat dazed condition, sitting on some gear wheels, and the bruises on his back and head must have been caused by a fall which was hard enough to cause the dazed condition in which he was. He climbed out of the pit up the steps for that purpose, took off his overalls and was taken to Dr. Miller for examination and then home. He was helped out of the car and walked without help to the doctor's office. The doctor gave him a casual examination, finding a bruised spot on his back a little to the right of the spine, just below the floating rib, between it and the hip. He did not discover the injury to the head. Spalding went home in the car and was helped into the house, where his family took care of his injuries. No physician was called. His back where it was injured turned blue and green, and his head, where

hurt, was bandaged. About a week or ten days later he called on Dr. Miller again, but the doctor did not learn of the injury to his head. He returned to work within a week and worked throughout February, or nearly so. He quit then of his own accord because he could not get his mind on his work. He had been in that employment two and a half or three years and had been a competent worker, losing no time from sickness or otherwise. Straightening out fenders had been part of his work, and nearly two years after the accident, when the regular blacksmith of the plaintiff in error was sick, Spalding took his place until he returned to work, being the three days of January 15, 16 and 17, 1927.

After Spalding was injured his mind was confused. His mental confusion and lack of physical coördination were manifested by various things. He was nervous and agitated. In talking he would begin a subject and wander off to something else before he finished. At times he wandered away from home. He quit chewing tobacco because he could not spit properly and had difficulty in feeding himself. Before the injury he was enough of a mechanic to repair his automobile, take the engine apart and put it together again. After the accident he took it apart and could not put it together again and lost some of its parts. Before the accident he could put a roof on skillfully. Afterwards he was employed to put on a roof but made a complete failure, fixing the flashing upside down. He laid the roof so as to take water instead of shedding it. Harry H. Thale employed him to treat honeycomb to get rid of the bee disease "foul brood." He could not do that work because he would take a comb in his hand and then forget whether he had treated it or not. If a single comb were untreated it would contaminate a whole hive. E. W. Rittler employed him to put a door in a partition wall, but he was unable to do it though he had done the same thing for Rittler before the accident. He could not do the work and

was crying about it and about his condition. After the accident he cried frequently and without cause. He grew progressively worse from the time of the injury until his death. Strong, capable and healthy before he was hurt, he was unable to do effective work afterwards.

The judgment of the court under review rests upon the court's determination, upon the evidence, of the question of fact whether the condition of Spalding after his injury, and his subsequent death, were caused by his fall and injury. They followed the injury, but the mere existence of a changed condition after a certain event is not evidence that the event was the cause of the condition unless there is something in the nature and relation of the event and the condition showing that the one was the cause of the other. Courts will take judicial notice that a violent blow on the head may produce unconsciousness of longer or shorter duration and even result in death. A fractured skull may result in immediate death, or death after a longer or shorter time, or in recovery. These are physical effects. What the effect of a particular blow has been on the physical or mental powers of the subject of it is a question of fact to be determined by evidence in the particular case.

We have stated the material facts in the case except the evidence of the physicians and surgeons who testified as experts. No critical examination was made of the part of Spalding's head which struck the floor or the gear wheels, no X-rays were taken of his skull, and there was no autopsy or other examination after his death. Several physicians testified as experts. They were Drs. Beirne and Caddick, who were called by the defendant in error, and Drs. Blickhan, Irwin, Miller, Montgomery and Norbury, called by the plaintiff in error.

Dr. Beirne, a physician and surgeon of twenty-six years' practice, testified, in answer to a hypothetical question embodying the facts as shown by the evidence, that in his opinion the injury was a contributing factor in the death

of the person described in the question. He answered on cross-examination that he did not assume that if a man sustains an accidental injury resulting in a bump on his head and bruise on his back it would logically follow that he would be unable to pursue his work as a carpenter or as a blacksmith or that he would be insane three years after the injury and then die as a result of the first injury. It was not necessarily probable but it was possible, and was possible in this instance, that unless the injury involved an injury to the brain tissue or the spinal cord the result would not have followed; that not having the aid of an X-ray picture the doctor would determine from the symptoms which followed whether there had been an injury to the spinal cord or brain. In this case there was no X-ray picture, and the doctor's opinion was based upon the facts stated in the hypothetical question.

The same hypothetical question was answered by Dr. Caddick, who was present at the hearing and heard the testimony. He gave his opinion that the injury to Spalding had a bearing upon his death. In his cross-examination he stated: "The particular thing in the hypothetical question that impresses me most is that Spalding was able to go around and do his work before the injury and not afterwards, and I consider that fact of greatest importance in the formation of my opinion. I also attribute very much importance to the bump and the bruises on the back. The bump on the head is quite significant, though the size of the bump is not what impressed me." The doctor testified that hardening of the arteries or something else might have been a contributing factor; "that it would not be a natural inference that a natural disease caused the condition following the accident, in view of the fact that the man was well to all appearances before the accident, was able to do his work well, and after the injury those conditions existed;" that a serious result might follow an injury to the head though no fracture resulted; that a laceration of the

brain might follow, the symptoms being dependent upon the severity of the injury, from nothing up to unconsciousness; that the symptoms from a laceration of the brain can be a gradual injury, which gradually causes the brain to deteriorate in relation to its former or natural condition. "It is my experience—generally it is usually true—that when there is an injury of the brain or brain covering there are certain definitely marked symptoms—of nothing up to complete unconsciousness."

Dr. Blickhan, who had practiced medicine for thirty-nine years, was called on February 22, 1928, to attend Spalding, whom he found very sick, with an irregular pulse, and, according to the doctor's diagnosis, past medical aid. The doctor administered a hypodermic to give him relief, and instructed the lady of the house not to investigate or disturb him much and warned her that it was only a question of time. The doctor made no extensive examination but came back the following morning and again the next day. The following day he was called and informed that Spalding was dead. Spalding never spoke and was somewhat emaciated, but not very much so for a man with his ailment. His skin was cold and clammy. He had arteriosclerosis. The doctor did not make much of an examination, and would not attempt to do so with a man who was dying. He diagnosed the case as of one suffering with hardening of the arteries. The only examination he made of the condition of his arteries was feeling his pulse at the wrist. Because of his general appearance and the appearance of his eyes the doctor thought there was no necessity for making any further examination. No autopsy was performed. The doctor certified as the cause of death, embolism of the brain. He described an embolism of the brain as a blood clot floating in the blood, lodging in the brain and obstructing the circulation. His opinion was that the accident suffered in 1925 could not have brought about the death in 1928 by those injuries.

Dr. Edmund B. Montgomery, a practicing physician and surgeon in Quincy for over fifty years, testified that he was familiar with the condition of hardening of the arteries, or arteriosclerosis. It is generally due to advanced age, syphilis, alcoholism—a variety of causes. It occurs more particularly in people after middle age—advancing years. Embolism of the brain occurs in a good many cases and is a rather frequent occurrence. An embolism of the brain, or a pulmonary embolism, simply means a fragment or clot of blood which was washed in from some other part of the body, and is very frequent in persons who have never had or sustained any kind of an injury. Hardening of the arteries, affecting the brain, may produce a form of insanity which is quite characteristic in advanced stages. The smaller arteries and small blood vessels of the brain thicken, producing vertigo or dizziness more or less, and sometimes aberrations of different sorts. It affects the speech, the gait, the equilibrium, and produces vertigo—in fact, it is just a complex of symptoms due to a disturbed blood-vessels system for want of proper blood-supply to the brain. It may affect the eyes also. Once that condition begins it becomes progressively worse and does not improve with medication. In answer to a hypothetical question he stated that he had an opinion whether or not the injury received by Spalding produced or tended to produce, or contributed to, his condition of hardening of the arteries, and his opinion was that the injury was not a factor of that diseased condition. He was further of the opinion that the injury would not produce an embolism of the brain after that length of time. An embolism may finally result from a condition of hardening of the arteries or an embolism of the brain especially originating in the heart. An embolism is a fragment that gets in the blood-stream. It may be in one place or another, such as the kidney, heart, brain, lungs, or any place. Embolism usually excludes a hemorrhage. It is entirely different. It is a little fragment of blood that

occludes a blood vessel, whereas a hemorrhage is the rupture of a blood vessel, which is entirely different. Many very small blood vessels may be plugged by an embolus. It depends upon the size of the vessel that is plugged as to the symptoms that follow. From the testimony of the witnesses who described Spalding's actions, appearance and condition subsequent to January, 1925, Dr. Montgomery's opinion was that that condition was due to a hardening of the cerebral arteries.

Dr. Grant Irwin had been practicing as a surgeon and physician in Quincy for more than forty years and had had experience in cases of hardening of the arteries and embolism of the brain. He testified that if an injury is sufficient to produce an embolism the embolism usually appears immediately. If an embolism occurs as the result of a fracture of the leg and a blood vessel is injured and a clot forms and an embolism results therefrom in the patient, that embolism manifests itself early in the fracture or it may manifest itself in the duration of the healing period. He had known embolism where the patient had recovered and was ready to leave the hospital and died immediately, but that would be within six or seven weeks or two months, possibly. He would not expect an embolism to result from an injury occurring two or three years before the patient's death. "Assuming that a man was at work; that the wrench slipped in his hand and that he fell backwards on his back, striking his head on a cement or concrete floor sufficient to cause a bruise in the lumbar region and a bump on the back of his head; that such injury occurred in January, 1925, and that after three or four days he went back to his work and worked there three or four weeks; that he continued to work around the house and in 1927 worked again at the same job that he was working on at the time he was injured (that of a blacksmith); that subsequent to that time insanity occurred, and death resulted in February, 1928, from an embolism of the brain: I have an opinion and I

do not believe that there would be any connection between the injury, which occurred in 1925, and his death. I don't think the injury would have produced the condition which I have heard described as arteriosclerosis, or hardening of the arteries. I am of the opinion that those injuries would not cause arteriosclerosis."

Dr. J. E. Miller, a practicing physician and surgeon since 1893 and physician for the Illinois Power and Light Corporation in January, testified to his examination of Spalding on the day of his injury, and was of the opinion that Spalding's injury had nothing to do with his death.

Dr. Frank P. Norbury, a physician and surgeon of forty-two years' practice and of wide experience in the treatment of nervous and mental diseases in public and private hospitals, testified that an embolism is a clot which finds its way into the blood-stream and then floats on. If it goes into the brain it goes on until it comes to an artery whose caliber is too small for it and it stops, shutting off the blood supply beyond the point of occlusion. Arteriosclerosis is a deposit of lime salts in the muscular coat of the arteries which increases the hardness of the arteries. It does not necessarily mean a generalized condition. It may be localized—may be at the base of the brain—or generalized, leading to chronic cerebral atrophy or wasting. It is a progressive disease. The symptoms of advanced cases resulting in death are a progressive decline of the physical condition and a general letting down of the body, followed by death. That is preceded by a general wasting of tissue, a deposition of these lime salts in the arterial walls, and a degenerative process of the tissues. That is the gradual course. Arteriosclerosis that terminates suddenly is incidental to some vascular crisis—something acute brought about by thrombus, by embolism, by hemorrhage of a cerebral vessel, which is apoplexy. A person who is suffering from the disease in such an advanced stage will have, or usually does have, difficulty in speech, depending upon the

area and function involved. It may be in the frontal lobe, controlling the motor speech function. If that is the focus of trouble there may be a motor speech defect. If it is farther back it may involve the memory, and there will be a sensory defect of speech, or there may be both. There may be an area where the speech is cut off entirely and the individual still may have knowledge of what is going on but no ability to express himself. That, of course, depends upon the area of the cerebrum involved. With reference to becoming dazed in his locomotion, that may come about through a disturbance of equilibrium, which usually is in the posterior part of the brain—the motor nerves communicating there with the centers of equilibrium. Dr. Norbury testified further: "I was here in the court room this afternoon and heard the testimony of members of the family concerning the condition of Mr. Spalding prior to his death. I have an opinion as to whether the symptoms which were described by them are the symptoms of a person suffering from arteriosclerosis, and my opinion is that the patient had what is commonly called a chronic cerebral atrophy, which is a senile change incidental to arteriosclerosis, involving the capillaries as well as the stems. * * * Death is very likely to result from such atrophy and sclerotic condition of the brain consequent upon some vascular crisis. By vascular crisis I mean a crisis in the life of the blood vessels and a sudden insult that produces a condition that necessarily strains or attacks the vascular system, which may involve the vital centers and cause death. * * * A man who had received a bruise on the back of his head from falling backward and a bump on the back of his head, would not have such a condition of sclerosis as a result of those injuries. He had arteriosclerosis before he had the injury, and the injury couldn't produce the arteriosclerosis. * * * If the injury was sufficient to cause a laceration of the brain tissue or covering of the brain, death would not ensue after a period of three years from such an injury if the man was

up and around during that time. Lacerations of the brain are immediate in their effect. As stated by Dr. Miller, they heal or else they produce death. If they don't heal they will cause a hemorrhage which contributes to or results in death, depending, of course, upon the locality. But I could not conceive of an injury received over the back of the head and as producing a laceration. To begin with, it is the most protected part of the brain that we have. The occipital bone is especially constructed by the Creator to protect the brain and is the occipital bone of the skull. That is the way the brain is set—in a well-constructed and well-designed brain cavity—and the manner of its construction is to make use of curves and arches so built that the center is comparatively high, so that it is all curves and presents an arched surface to any blow. It will withstand a heavy blow or concussion, whatever it has to receive. The brain is well protected from outside injury, particularly so at the occiput. * * * Assuming the conditions which have been described here by these witnesses this afternoon, and assuming his condition to be as described by them and that he received the kind of blow which has been mentioned here, on the back of his head and upon his back, I have an opinion as to whether his death was a result of that blow, and it is my opinion that it was not due to the blow on the head or back."

That Spalding suffered an accident in the course of his employment and arising out of it is sufficiently established by the evidence. While nobody saw him at his work in the pit, he was known to be at work there on the car axle above his head and was found sitting on the floor or the gear wheels. The bruise on his back and the bump on his head were sufficient evidence, in connection with the nature of his work, the manner in which he had to do it, the tool used to do it and the statement elicited on cross-examination of the shop foreman by the defendant in error's attorney that Spalding said he was using a socket-wrench, which

slipped off a nut and let him fall backwards, that an accident had occurred in the course of his work and arising out of it. The bruise on his back and the bump on his head were also proved, as well as his absence from work for three or four days, after which he returned to work for three or four weeks. The basis of the claim of the plaintiff in error is that the accident was the proximate cause of a condition which incapacitated him for the performance of physical labor and three years after its occurrence caused his death.

It is clear that neither Spalding himself, his family nor Dr. Miller, the company physician who examined him, regarded his injury as of a serious nature. Dr. Miller did not discover the bump on the head. He described the bruise on the back as a bruise of the skin a little to the right of the spine, between it and the hip, and said there were also some scratches on the hand. He did not think the case was one which should be followed up. No one did follow it up. Spalding returned to work but did not get along with it well. He could not get his mind on it according to the foreman, and finally quit about a month after the accident. He came back to work two years later, in January, 1927, for three days and took the place of the regular blacksmith, who was sick and absent for that length of time. He did the work but not so well as the blacksmith would have done it. In the meantime he had undertaken to do work of a kind which he had formerly been accustomed to do but was unable to do it, as has been previously stated in this opinion. The defendant in error claims that this condition of inefficiency and incapacity was proximately caused by the accident on January 31, 1925, and that his death on February 26, 1928, was finally caused by the same accident. The plaintiff in error claims, on the other hand, that the accident of January 31 was of slight consequence and had nothing whatever to do with Spalding's mental condition or his death. This is the issue to

which the evidence, which has been recited at considerable length, was directed.

Dr. Beirne's testimony in chief consisted of his answer to one hypothetical question, which was, that he thought the injury was a contributory factor in his death. He was cross-examined, and stated that he answered the question on the conditions stated in it and the evidence submitted which he heard from the witnesses. The only pathology taken into consideration was that mentioned in the question. There were, or could be, other factors, of course, that produced that condition, and Spalding might have had these conditions and become insane without ever having had a bump on his head or bruise on his back. It would not make much difference about the size of the bump or its severity. Whether the bump was sufficient to cause any injury to the brain tissue would be a factor. The brain tissue or tissue of the spinal cord would have to be involved and pathology produced by that be the cause or contributing cause. Assuming there was no pathology, no injury to the brain tissue, he would not say it was due to the injury. Dr. Beirne testified that he believed the brain tissue was involved in the injury; that there is no way, except by using the X-ray and by the results, of determining after an injury the extent of the injury to the brain tissue. If no evidence of fracture was found, the doctor said, he would assume there was an injury to the brain tissue if the symptoms were serious. "They will usually collapse—unconscious—things like that." A bruise in the back about the size of a hand, in the lumbar region, might or might not of itself produce the condition and death testified to. In order to produce that condition there would have to be an involvement of the spinal cord or brain.

Sufficient mention has already been made of Dr. Caddick's testimony. Both of these witnesses base their opinion that the injury to Spalding by his fall caused his subsequent condition and his death three years later, on the

hypothesis that the fall caused a laceration of the tissue of the brain or of the spinal cord. They concede that if there was no laceration of the tissue of the brain or of the spinal cord the injury from the fall was not the cause of the subsequent condition or the death of Spalding. The only evidence, however, which Dr. Caddick suggests is that Spalding before the fall was able to do his work and was not able to do it afterwards. This argument assumes the very thing in controversy. *Post hoc ergo propter hoc* is a fallacious argument. In fact, the argument seems to be: Spalding was a capable, efficient and skilled workman before his fall but in a few days or weeks afterwards lost his skill, his self-control and mental power, and gradually became incapable, inefficient and finally entirely *non compos mentis;* therefore the fall must have been the cause of this degenerative change. Dr. Beirne did not know Spalding in his lifetime. So far as the record shows, neither Dr. Caddick nor any of the other physicians who testified, except Dr. Blickhan and Dr. Miller, knew him. The testimony of Spalding's family and friends indicates a progressive failure in his mental and physical powers after the happening of the accident resulting in his abandonment of his employment with the plaintiff in error and his progressive loss of mental power and culminating in his death.

The rules of law which govern the decision of this case are well settled. The burden is on the claimant to prove an injury sustained as the proximate result of an accident suffered in the course of the injured person's employment and arising out of his employment. (*Sears, Roebuck & Co.* v. *Industrial Com.* 334 Ill. 246; *Freeman Coal Co.* v. *Industrial Com.* 315 id. 84.) He is not entitled to compensation for a condition resulting from a pre-existing disease and not the result of an accident suffered in the course of his employment and arising out of it. If there is a pre-existing disease the employee is entitled to recover for all the consequences attributable to the injury in the accelera-

tion or aggravation of the disease. Such aggravation or acceleration, permanent and progressive in its nature, will entitle the employee to compensation to the extent and in the proportion in which the pre-existing disease is increased or aggravated. Mere predisposing physical condition does not affect the right to compensation. If an accident results in a lesion, or a new condition of which it is the proximate cause, there may be a recovery of compensation for the same, regardless of predisposing conditions making the employee more susceptible to the injury. (*Big Muddy Coal and Iron Co.* v. *Industrial Board,* 279 Ill. 235; *Peoria Railway Terminal Co.* v. *Industrial Board,* id. 352; *Spring Valley Coal Co.* v. *Industrial Com.* 289 id. 315; *Springfield Coal Co.* v. *Industrial Com.* 300 id. 28.) The claimant has the burden of proving not only that an accident happened but also that the accident was the proximate cause of the injury suffered or the condition of incapacity for which compensation is sought—that is, he must prove the causal connection between the accident and the condition of the incapacity which constitutes his claim for compensation. (*Sanitary District* v. *Industrial Com.* 343 Ill. 236.) The liability cannot rest upon imagination, speculation or conjecture but must be based upon facts established by a preponderance of the evidence. (*Springfield Coal Co.* v. *Industrial Com.* 303 Ill. 528; *St. Louis Smelting Co.* v. *Industrial Com.* 298 id. 272; *Decatur Construction Co.* v. *Industrial Com.* 296 id. 290.) It cannot rest upon a choice between two views equally compatible with the evidence. (*Peterson & Co.* v. *Industrial Board,* 281 id. 326; *Byram* v. *Industrial Com.* 333 id. 152; *Railroad Water Co.* v. *Industrial Com.* 334 id. 52; *Berry* v. *Industrial Com.* 335 id. 374; *Green* v. *Industrial Com.* 337 id. 514; *Carson-Payson Co.* v. *Industrial Com.* 340 id. 632.) There can be no award where the condition results from a pre-existing disease and not from an injury. (*St. Louis Smelting Co.* v. *Industrial Com. supra.*) The court will not substitute its

judgment for the commission's unless the latter is clearly and manifestly against the weight of the evidence. *Sanitary District* v. *Industrial Com. supra; County of Cook* v. *Industrial Com.* 327 Ill. 79; *Armour Grain Co.* v. *Industrial Com.* 323 id. 80; *Superior Coal Co.* v. *Industrial Com.* 318 id. 328.

Applying these rules to the case before us, the Industrial Commission had the duty of hearing the application and determining the question which, as it was finally submitted, was, Did the defendant in error prove by a preponderance of the evidence that the injury received by Spalding in his fall was the proximate cause of his subsequent condition of disability? There is no serious conflict in the evidence about any fact in the case. There is no disagreement about the law. The matter depends upon the conclusion to be drawn from all the uncontradicted evidence concerning the facts and the divergent opinions of the expert witnesses. The existence of the condition of disability must be conceded. The question for decision is, Was its proximate cause the fall in the pit? The only witnesses who testified as experts who had any personal first-hand knowledge of Spalding and his injury were Dr. Miller and Dr. Blickhan. Their testimony has been recited in this opinion, Dr. Miller having examined him at the time of the injury and Dr. Blickhan having attended him during the last three or four days of his life. Each stated that Spalding had had hardening of the arteries and expressed his professional judgment that the injury in 1925 could not have been the cause of his death in 1928. All expert witnesses who testified agreed that an injury, as a fall or blow, to produce the condition from which Spalding suffered, must have caused a laceration of the tissue of the brain or the spine. Dr. Miller did not think the bruise on the body sufficient to require an examination by X-ray, and he made no examination of the head by X-ray because Spalding did not complain of his head. He testified that, assuming the

blow was sufficient to produce a brain lesion, the patient would probably be carried into the office in an unconscious condition, and the symptoms and conditions which he found were such as to indicate no brain lesion at all.

It is unnecessary to comment further on the testimony of Dr. Norbury, Dr. Montgomery and Dr. Irwin. From a consideration of the testimony of all the witnesses the commission would have been justified in finding that Spalding was suffering from hardening of the arteries, which was the cause of the progressive decay of his mental and physical powers; that this affection is the result of deposits of lime salts in the walls of the arteries, and was not and could not have been caused or lighted up or made worse by a fall or a blow; that the acts and symptoms shown by the evidence could not have been produced by the fall unless there had been a laceration of the brain or spinal cord tissue, of which there is no evidence; that the fall and consequent injury, if it had caused a laceration of the tissue of the brain or spinal cord, would have more serious immediate results as unconsciousness and physical helplessness. If the commission made such findings there is ample evidence in the record to sustain them. The circuit court is not authorized to substitute its judgment, on the facts, for that of the commission unless the latter's judgment is manifestly contrary to the weight of the evidence, and our authority in this respect is no greater than that of the circuit court.

Questions in regard to the giving of notice to the employer, which have been argued, have not been considered in view of the conclusion reached in this opinion.

The circuit court erred in setting aside the order of the Industrial Commission, and its judgment is therefore reversed and the cause is remanded, with directions to enter a judgment confirming the decision of the Industrial Commission. *Reversed and remanded, with directions.*