(No. 3676— )

DAVID A. PESAVENTO, Claimant, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed May 12, 1943.*

H. E. CHRISTENSEN and JOHN L. WALKER, for claimant.

GEORGE F. BARRETT, Attorney General; WILLIAM L. MORGAN, Assistant Attorney General, for respondent.

ECKERT, J.

On July 10, 1941, claimant, David A. Pesavento, a member of the Illinois State Highway Maintenance Police, answered a call to proceed to the scene of an accident about one block south of Kankakee River Drive on State-Federal Route 66A in Will County, Illinois. Upon arrival at the scene of the accident, claimant found a Pontiac automobile turned over on the highway, and while assisting the owner to lift a tool box into the squad car, suffered a sharp pain in his back. The box was three or four feet long, eighteen or twenty inches wide, about one and one-half feet deep, and weighed approximately seventy-five pounds.

Claimant reported the injury to the district police office, and on the instructions of his superior officer, consulted Dr. W. J. Fahrner at Joliet. Dr. Fahrner found that claimant had suffered a sacro-illiac strain affecting the right side, and taped claimant's back. On the fifth day after the accident, claimant was supplied with a brace and returned to work. He continued in the employ of the State until September 27, 1941, when he was discharged.

Claimant was employed by the Department of Public Works and Buildings, Division of Highways, Bureau of Police, as a police officer from March 1, 1931, to February 10, 1933. During the years 1933 to 1938, claimant worked as a truck gardener and farmer, and during the years 1938, 1939, and 1940, worked for the Federal Government successively as a truck driver and clerk. On January 7, 1941, he was again employed as a police officer by the Illinois State Highway Maintenance Police in district No. 5, with headquarters at

Joliet. Throughout this last period of employment, he received a salary of $175.00 per month. At the time of the accident, he had no children under sixteen years of age dependent upon him for support. He received his full salary during the period of his temporary total disability from July 11th to July 14th, 1941, the amount of compensation paid in the form of salary being $22.58. The respondent also paid $22.00 to Dr. W. J. Fahrner of Joliet for services rendered claimant in connection with the accident.

On July 30, 1941, Dr. Fahrner reported to the respondent in reference to the claimant as follows:

"Patient's story of accident: while helping to lift a tool box in an auto accident, suffered a severe catch in his back. Nature of injury: sacro-illiac strain affecting the right side. Treatment: at first taped and sacro-illiac support applied later. Date patient was discharged: July 14, 1941. Permanent disability expected: none."

Claimant signed and submitted to the district office weekly reports concerning his activity as police officer throughout the period of July 10th to September 27th, 1941, inclusive. From these reports, it appears that claimant was on active duty as a State police officer except for four days following the injury.

Claimant testified that before entering upon his duties as an officer of the Illinois State Police on January 7, 1941, he was given a complete physical examination, and that by direction of his superior officers, he was again examined at Kankakee on May 1, 1941. Apparently no physical defects were evident at the time of either of these examinations.

Claimant also testified that his injury occurred while giving aid and assistance in accordance with instructions from his superior officers; that he was ordered back to work by the chief clerk of the district office on July 14th, and advised that if he did not return, his salary would stop; that he returned to work wearing the brace, but that if he bent over, he suffered pain in his back. He also testified that he worked from nine to sixteen or eighteen hours a day during the period following the injury, working days until the middle of August, and then nights, for a four-week period.

Claimant testified that about the time he began working nights, he felt pain in his left side and chest and that he had difficulty sleeping. His average weight prior to the accident was 155 to 160 pounds; his present weight is 132 pounds.

After claimant left the employ of the State, he worked for the sheriff's office in Will County for one week during October, 1941. The condition of his health was such, however, that he consulted Dr. Arthur Fahrner, who advised him that he had a heart injury, and that he must give up his employment. Since that time he has been under the constant care of Dr. Fahrner, and has himself paid for these services. The record, however, does not show the amount.

Claimant testified that he is still unable to work; that he is short of breath; and that he has a heavy pounding over the heart, and a pain in the lower part of his spine. He testified that he is still unable to sleep, and that he is easily exhausted.

Dr. Walter A. Fahrner, called as a witness for claimant, testified that he first examined claimant on July 10, 1941, shortly after the accident. Claimant at that time was unable to stand straight, was bent to the left, and some of the ligaments and muscles of his back were torn. Following diagnosis of sacro-illiac strain, claimant was strapped and a brace was prescribed. The doctor testified that the last time he saw claimant was about six weeks after the accident, at which time "he still was having a residue of his trouble." He expressed no opinion as to the cause of claimant's present disability.

Dr. Arthur H. Fahrner, called as a witness for claimant, testified that he first examined claimant on October 13, 1941, and found blood pressure decreased from normal, an inflammation of the heart muscle, and an enlargement of the heart. The doctor testified that he had treated the claimant steadily since that time, and upon examination on June 22nd, 1942, found claimant's condition substantially unchanged. In answer to a hypothetical question, the doctor stated:

"Well, yes, there is a probability that when he lifted an object that weighed seventy-five pounds that might have thrown some strain on the heart. Of course I can't be one hundred per cent positive of it, because the only thing I can be positive of is what I found at my physical examination, but apparently this condition had been existing for sometime, I would say, because it was fairly well established, which could have been for several months, it could have been in existence. It was not just a recent happening, because it had already been tending toward a chronic inflammation, anything which is two or three months or more along we call chronic inflammation. Anything before that we call acute inflammation, especially of heart muscle tissue."

Upon cross-examination, Dr. Fehrner testified that the condition might have existed for months; that it can exist for

years, or can be of very recent origin; and that the same symptoms are present regardless of the length of time the condition exists. For that reason he found it impossible to say definitely how long the heart condition had been present. He also testified that heart trouble is seldom caused by trauma, although heavy lifting can cause the heart to dilate or enlarge, and that the medical profession is unable to trace heart conditions back to their origin. He was definitely unwilling to state that claimant's present condition is the result of the injury of July 10, 1941.

Included in the record is a report of Dr. Chauncey C. Maher, a specialist in internal medicine and cardiovascular disease, who examined the claimant on June 19, 1942. Dr. Maher stated:

"The cardiac findings in this man deviate very mildly from the normal, and in my opinion are probably not closely related to his present complaints. He has an irregularity of the pulse, which is technically known as premature auricular systoles. Normally the pulse beats quite regularly, similar to the ticking of a clock. In this patient there is an occasional beat which occurs prematurely in the rhythm, and it is possible that he is conscious of this and it may be somewhat annoying. The significance of this irregularity, however, from a medical standpoint is negligible. Many patients with normal hearts have this irregularity and it has no serious significance. It does not indicate any damage to the heart muscle, valves or blood vessels, and does not indicate future heart disease. He also has a very slight systolic murmur, which is also not significant. The size and shape of his heart is normal and quite characteristic of his general build, and he has a normal electrocardiogram except for the extra beats already mentioned.

"This man also has changes in his peripheral arteries. This is particularly noticeable in the radial artery which goes to the arms and hands. Sclerosis of this artery suggests that this is present in other arteries of the body. Arteriosclerosis, or hardening of the arteries, is a generalized disease which increases with age. One might consider the possibility that this man's arteries are somewhat more sclerotic than the average man of 47 years of age.

"It is my impression that the primary problem in this patient is concerned with the lesion in his lung. It would be impossible to tell you with certainty that this patient has an active tuberculosis infection, but the x-ray findings are strongly suggestive of this classification. His subjective symptoms, other than pain in the leg, would also suggest an active tuberculous infection.

"In conclusion, this patient has some minor findings with regard to the rhythm of his heart and a slight systolic murmur, but cannot be classified as having organic heart disease. The cardiac findings are not significant and are in no way related to his occupation or his injury. He does have, however, a generalized arteriosclerosis, which is particularly manifested in the arteries to his extremities. His subjective symptoms and the x-ray findings strongly suggest that he has pulmonary tuberculosis, probably active."

Claimant now seeks an award, alleging complete disability, in the amount of $4,400.00, and pension for life, as provided by the Workmen's Compensation Act of this State. At the time of the accident, claimant and respondent were operating under the provisions of that Act, and notice of the accident and claim for compensation were made within the time provided by the Act. The accident occurred while the claimant was in the performance of his duties for the respondent and arose out of and in the course of his employment.

The claimant, however, has a burden of proving the causal connection between the accident and the condition of incapacity which constitutes his claim for compensation. *Sanitary District* vs. *Industrial Commission,* 343 Ill. 236; *Sears Roebuck & Company* vs. *Industrial Commission,* 334 Ill. 246. Liability cannot rest upon imagination, speculation, or conjecture, but must be based upon facts established by a preponderance of the evidence. *Springfield District Coal Company* vs. *Industrial Commission,* 303 Ill. 528. It cannot rest upon a choice between two views equally compatible with the evidence. *Rittler* vs. *Industrial Commission,* 351 Ill. 338; *Carson Payson Company* vs. *Industrial Commission,* 340 Ill. 632.

The medical testimony in this case shows that claimant's physician is unable to determine whether or not claimant's disability is a result of the injury. Dr. Arthur H. Fahrner testified to a *possibility* that the lifting of the tool box might have thrown some strain on the heart. He was unable to determine how long a period of time the alleged chronic inflammation had existed. Dr. Fahrner also testified that a trauma seldom causes heart trouble. The cardiac findings of Dr. Maher were insignificant, and in no way related to claimant's incapacity or injury. Dr. Maher, on the other hand, found claimant suffering from a generalized hardening of the arteries, with a strong suggestion of pulmonary tuberculosis, probably active. None of the medical testimony shows that claimant's present incapacity is a result of the injury incurred in his line of duty.

Claimant has not sustained his burden of proving the causal connection between the accident and his present disability. Any liability in this case would be based, not upon facts, but upon conjecture; there are two views equally compatible: (1) that claimant's disability is a result of the

injury; (2) that claimant's disability is a result of a generalized hardening of the arteries and tuberculosis.

An award must therefore be denied.