GABRIEL *v.* A. J. SMITH CONSTRUCTION CO.

1. MASTER AND SERVANT—WORKMEN'S COMPENSATION ACT—INDUS-
TRIAL ACCIDENT BOARD TRIER OF FACTS—INFERENCES—REVIEW.
    In proceedings under the workmen's compensation act the
    industrial accident board is trier of the facts, and it is
    not for the court, on certiorari to review an award for
    the accidental death of an employee, to analyze, discuss
    or pass upon the arguments of counsel in support of their
    respective theories as to how deceased came to his death,
    if the facts, disputed or undisputed, give opportunity for
    the board in its discretion to draw a natural and rational
    inference that his death resulted from an accident while
    engaged in his master's business within the scope of his
    employment.

2. SAME—FINDING OF BOARD—INFERENCES—SCOPE OF EMPLOYMENT.
    Where a water boy on a high building in process of con-
    struction fell down the skeleton elevator shaft used for
    hoisting materials and was' killed, evidence that he was
    in the habit of sending his water pail upon said elevator
    to the floor where needed, with the apparent consent of
    the employer, while he went up the ladder to said floor
    and took the pail from the elevator floor, and there was
    no evidence that he ever rode on the elevator contrary to
    instructions, or violated any instructions, or was careless
    or reckless in the performance of his duties, and no one
    saw him when he fell, *held,* sufficient to justify the in-
    dustrial accident board in its discretion in drawing a
    natural and rational inference that his fall and death
    resulted from an accident while employed in his master's
    business within the scope of his employment.

Certiorari to Industrial Accident Board. Submitted
April 23, 1919. (Docket No. 90.) Decided July 17,
1919.

Rocco Gabriel presented his claim for compensa-
tion against the A. J. Smith Construction Company
for the accidental death of his decedent in defend-
ant's employ. From an order awarding compensation,

defendant, and the General Accident, Fire & Life Assurance Corporation, Limited, insurer, bring certiorari.   Affirmed.

*Kerr & Lacey,* for appellants.

*Paul P. Colombo* (*John F. Kennedy,* of counsel), for appellee.

STEERE, J.   Mike Gabriel, son of plaintiff, met his death on May 23, 1917, by falling down the shaft of a temporary skeleton elevator at a high building called the Fort Shelby hotel, then in process of construction at the corner of First street and Lafayette boulevard in the city of Detroit.   The A. J. Smith Construction Company was engaged as contractor in the erection of this building, and deceased was employed by it as a water boy.   He was 16 years of age, of Italian parentage, and was paid $2 per day of 10 hours.   His work consisted of obtaining and carrying drinking water to the men working upon the building wherever they might be.   He had been steadily so employed for about a month before his death.

The structure of the incompleted building had been carried up eight stories at the time of the accident. A temporary elevator or material hoist stood about four feet from the building, the shaft being of an open, skeleton design constructed of wooden uprights braced and strengthened by cross-pieces in an "X" form, having from each floor of the building an open landing platform or passageway of boards or plank reaching across the intervening four feet to the shaft by which the hoisted material was taken from the elevator into the building at the several floors as required.   The elevator itself was a platform and skeleton frame moved up and down the shaft by electric power with proper mechanism in the basement operated in response to a system of bell signals and was

used for hoisting or lowering material, tools, etc., as occasion required in connection with the construction work. None of the employees was permitted to ride upon this material hoist, and temporary stairs or ladders between floors were put up in the building for their use as the erection progressed. Notice was posted at the elevator prohibiting riding upon it. So far as shown this prohibition was not violated by any of the employees.

The drinking water was carried to the men on the job in a common water pail with a dipper in it for their use. Deceased's duties were to supply their wants in that particular and take the water to them where they were at work on different floors. In the performance of his duties he customarily carried the filled pails of water to the elevator or hoist and sent them up by it to the floor or floors where water was wanted and then would proceed by the ladders, or stairways, provided for the workmen to the floor where the water had been sent and carry it from the elevator to the men where they wanted it. A witness of defendants who testified that this was done "quite customarily" stated that he had seen the water boy get the pail off the elevator himself and, so far as witness knew, he generally did so.

Manifestly dangers and risks not even common to all the employees attended the services of this water boy in his trips serving water to the men in various parts of that tall and unfinished building, where conditions were constantly changing as the work went on. As his duties took him to all places where men were working he was not at any time long under the eye of or associated with any particular man or group of men. He fell down the shaft in the early part of the forenoon. No one noticed him go to the place from which he fell, or saw him when he started to fall, or knew what he was doing at that time. A

workman on the 7th floor saw him come up the stairway that morning, and noticed him with a pail serving water on that floor about 15 minutes before hearing of the accident, but did not particularly watch him while there or pay any attention to where he went. No witness testified to seeing him after that time until he was falling. A foreman of the construction company called by defendant testified that he remembered seeing "Mike, the water boy," that morning some time before the accident when he was one or two floors below the eighth floor, to which construction had then progressed with no floor above it and which was being completed that morning; that later, while standing 15 feet west of the permanent elevator shaft left in the center of the building on the 8th floor for a passenger elevator when the construction was completed, he saw the boy falling down the material hoist or temporary elevator shaft. His account of the incident in reply to questions by defendants' counsel is as follows:

"Q. Where was he the day he was killed, when you saw him?

"A. Falling down the elevator shaft.  *  *  *

"Q. What was it that directed your attention to the fact that Mike was falling?

"A. The man I was talking with directed my attention to it, and wheeled me around to look.

"Q. Who was that man?

"A. A man by the name of McClellan.

"Q. What did you see as you turned around?

"A. I saw the water boy falling through the shaft —down the shaft.

"Q. At that time was he on the level of the floor or above?

"A. Above the floor.

"Q. How could he have gotten above the floor?

"A. Well, he might have fallen off the elevator— he might have jumped off the floor—

"Q. How far above the level of the floor was he?

"A. Three feet—about 3 feet.

"*Q.* In what position was his body as you saw him falling?

"*A.* Feet first.

"*Q.* Were any of his hands—

"*A.* One hand was extended above his head.

"*Q.* Did you notice where the platform of the elevator was at that time?

"*A.* It was up to what we call the cat-head—the platform was as far as it could go on the shaft.

"*Q.* Could a man of Mike's physical stature have jumped and been in the position in which he was at the time you saw him?

"*A.* No.

"*Q.* Was it any part of Mike's duties to make repairs on the elevator shaft?

"*A.* No, sir."

This witness further testified that the boy's duties were "to carry water to the men on the job" and in so doing he was permitted to go above the first floor to "where the men were working"; and that at the time he fell his water pail with water in it stood in the middle of the floor in front of the permanent elevator shaft. McClellan, who he said wheeled him around to look at the time Mike fell, was not called as a witness.

The construction company engaged in erecting this building was under the workmen's compensation act and in reporting the accident to the industrial accident board adopted the theory of the "cause and manner of the accident," as "riding on elevator (contrary to orders) and jumped off platform through hoist and fell back down shaft," and declined to recognize any liability under the law. The testimony of all witnesses working there at that time who were interrogated is positive that they never saw any employees riding upon this elevator. The foreman, Ryan, was asked "Did any men ride on the hoist (elevator) at that time?" and answered "No, sir." There is no proof that this boy was ever seen riding upon the

elevator, was ever reprimanded for his conduct while at work upon the building, that he neglected his duties or violated any instructions, or was careless, reckless or negligent in the performance of his duties. Defendants' theory is based solely upon the fact that the boy fell down this elevator shaft and what Ryan, who said deceased "might have jumped off the floor" and that he could not have jumped, testified to.

A claim for compensation under the act was filed by plaintiff, father of deceased. Upon hearing before a committee of arbitration selected under the statute an award was made of compensation at the rate of $5.77 per week for a period of 300 weeks. Upon review of this award before the full industrial accident board it found that the father was a widower who had recently buried his wife and had a family of four children of whom Mike was the oldest, the three others being little girls; that Mike always turned his wages over to his father and they were used for the support of the family which at times had received assistance from the city as the father was in poor health and unable to work regularly, and the earnings of both of them had proved insufficient for the family needs. Making deductions for the maintenance of deceased by his father, and going somewhat at length into the condition, needs and income of the family, which it is unnecessary to detail, the board found the award by the committee of arbitration excessive and reduced it to $2.66 per week.

Of the four assignments of error made by defendants in their application for certiorari only the following one is urged and argued in their brief:

"The committee erred in finding that the accident resulting in the death of Mike Gabriel arose out of and in the course of his employment with the A. J. Smith Construction Company within the meaning of the compensation law."

It is undisputed that the ambit of this boy's employment was anywhere on the construction job on any parts or floors where men were at work and might want water. His duties were to get pails of water from below to where men were working on the different floors in this tall building and serve them. There is no proof that he was ever instructed to carry these pails of water up the temporary ladders from story to story. It is self-evident that a force of men must have been working at the top most of the time as the building went up and stories were added. Neither is it shown nor is there any presumption that he had but one pail with which to serve all the workmen on the different floors. It was undisputed that the hoist for carrying up material was customarily used by him to send up the pails of water to the different floors during the time of his service there, that he did this regularly, openly and presumably under instructions as to his duties, climbing up the stairs and taking them from the elevator at the different floors to which they were sent. That the use of the elevator for that purpose was proper, so recognized by defendant and continued after the accident is shown by one of defendants' witnesses who testified to the custom while deceased was there, and added:

"After he was killed they had another boy, and they would not allow him to take the water off the elevator. I had been working right near the elevator and he could ask me to take it off, and I give the signals for the elevator to go down.

"Q. Well, was it customary for the man operating the machine to send the water up to the water boy in the elevator to whichever floor he was?

"A. Yes, there was a man down below on the ground floor, and the water boy would generally leave the water in, and go up the ladder.

"Q. So that the water pail with its contents of water was generally sent up on the elevator?

"A. Yes."

From this it is evident that the only change in custom, or method, after Mike was killed was to have one of the workmen on the floor to which the water was sent go over the unguarded passage to this skeleton elevator and carry the water from it to the floor, instead of the water boy as was the former practice.

As has been often said, the industrial accident board is trier of the facts, and it is not for the court to analyze, discuss or pass upon the arguments of counsel in support of their respective theories as to how this boy came to fall if the facts, disputed or undisputed, give opportunity for the board in its discretion to draw a natural and rational inference that his fall and death resulted from an accident while engaged in his master's business in the line of duties falling within the scope of his employment. Without following counsel in their claimed application or nonapplication of the cases cited where the question of whether any evidence direct or inferential could be discovered to support the board's finding, we conclude that the evidence in this case clearly distinguishes it from *Lobuzek* v. *Foundry Co.*, 194 Mich. 533; *Moyer* v. *Packard Motor Car Co.*, 205 Mich. 503, and other cases cited, where it affirmatively appeared undisputed that the use of a place or appliance was forbidden, or entirely out of the employee's range of work or line of duty; and fairly make applicable the rule recognized and reasons therefor discussed in *Papinaw* v. *Railway Co.*, 189 Mich. 441; *Wishcaless* v. *Hammond, Standish & Co.*, 201 Mich. 193, and analogous cases where the undisputed facts do not preclude a rational inference that the employee met his death in the line of duty.

The award will stand affirmed.

BIRD, C. J., and OSTRANDER, MOORE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred.