TANNER *v.* ALUMINUM CASTINGS CO.

1. MASTER AND SERVANT—WORKMEN'S COMPENSATION ACT—CERTIO-RARI—EVIDENCE—SUFFICIENCY.

On certiorari to review an award by the industrial accident board under the workmen's compensation act, the award will be affirmed if there is any competent evidence from which the inference might properly be drawn that death resulted from the accident alleged.

2. SAME—CAUSE OF DEATH—EVIDENCE—SUFFICIENCY.

Evidence that deceased employee's death was caused by septicemia resulting from a wound in the wrist arising out of and in the course of his employment, *held*, sufficient to sustain an award of compensation by the industrial accident board, although there was also evidence that death was caused by lobar pneumonia.

Certiorari to Industrial Accident Board. Submitted April 20, 1920. (Docket No. 95.) Decided June 7, 1920.

Frances Tanner presented her claim for compensation against the Aluminum Castings Company for the accidental death of her husband in defendant's employ. From an order awarding compensation, defendant and the Hartford Accident & Indemnity Company, insurer, bring certiorari. Affirmed.

*Miller, Canfield, Paddock & Perry,* for appellants.

*Clarence Kellogg,* for appellee.

CLARK, J. Frances Tanner, the applicant, is the widow of Edward Tanner, who, on November 10, 1917, suffered an accidental personal injury arising out of and in the course of his employment with defendant Aluminum Castings Company. The industrial accident board found that Mr. Tanner died on February

On review and appeal in action for death of employee under Workmen's Compensation Acts, see notes in L. R. A. 1916A, 163, 266, and L. R. A. 1917D, 186.

6, 1918, and that said injury was the proximate and contributing cause of his death, and that by reason of the general weakness and low vitality of the deceased as a result of such injury, he succumbed to an illness which, on January 20, 1918, showed pronounced and alarming symptoms. It is contended that there is no evidence to sustain this conclusion and none from which the required inference can be drawn.

"In proceedings under the workmen's compensation act, the industrial accident board is trier of the facts, and it is not for the court, on certiorari to review an award for the accidental death of an employee, to analyze, discuss or pass upon the arguments of counsel in support of their respective theories as to how deceased came to his death, if the facts, disputed or undisputed, give opportunity for the board in its discretion to draw a natural and rational inference that his death resulted from an accident while engaged in his master's business within the scope of his employment." *Gabriel* v. *Construction Co.*, 206 Mich. 471 (quoting from syllabus).

The agreement for compensation between deceased and defendant insurance company was in effect at the time of the death and compensation at the maximum amount had been paid to February 2, 1919. There was testimony that Tanner's injury had been caused by a bullet passing through the hand just below the wrist striking the ulnar bone and severing a small artery. Tanner held his wrist and had a handkerchief tied around it to prevent bleeding, but there was bleeding, a hemorrhage, spurting, but the main steady bleeding was venous. Dr. Gray, employer's physician, treated the wound, packed it with gauze to check bleeding and put on a tourniquet. The doctor dressed the wound daily but every time he removed the dressing the hemorrhage would start. The doctor had Tanner taken to Harper Hospital that the severed blood vessel might be ligated, but the operation was

delayed several days during which time there was bleeding and on November 18th an artery let go, the bleeding became active and the doctor at once ligated the artery. There was some bleeding for a number of days after the operation. Of the bleeding before going to the hospital, a witness said: "the blood just spurted all over everything" and that it took about 15 minutes to get it stopped, and another witness said: "the blood was spurting all over the rug and stained the table cloth." The wound became infected and there was a discharge from it. The arm was packed in ice the first few days at the hospital and it was swollen as one witness said "away up above the elbow." Tanner left the hospital November 26th and was confined to his home for about two weeks, during which time, applicant stated, there was a continuous discharge from the wound and the doctor came every day and dressed it and after two weeks the wound seemed to be healing and the swelling began to go down and the doctor did not come so often. Tanner began walking about. He was weak, not strong as he had been before the accident. He became ill January 20, 1918, and died February 6, 1918. Three or four weeks before his last illness the wound had not healed because of the infection and the doctor had continued the dressings. Dr. Wallace, who attended in the last illness, gave the cause of death as lobar pneumonia. Dr. Gray, employer's physician, testified:

"A. I understand that you wanted to know whether he would be more apt to acquire the disease in the first place on account of having this accident; and if he would be more apt to die if he did acquire the disease, on account of his having this accident previously.

"Q. Well, let's divide that in two questions. In the first place, Would he be more apt to acquire the disease?

"A. I think he would.

"Q. The second question is, Would he be more apt to succumb?

"*A.* Of course, his vitality was somewhat — was somewhat lowered, and his chances for recovery, of course, would be better if he had been in real good physical condition at the time.

"*Q.* Yes; and had not suffered this wound.

"*A.* No question about that. It is just the matter of degree.    *    *    *    I wasn't notified right away when he was taken sick (January 20, 1918) because they called in their family doctor, and it was within a week after he was taken sick that I saw him.

"*Q.* How did you come to go up there, doctor?

"*A.* Well, I was informed that he was sick. I think Mrs. Tanner phoned to me that he was sick, but I don't remember whether I heard it over at the plant besides that, or not. Anyway, I called on him at that time.

"*Q.* Well, you were interested in the case?

"*A.* Yes, sir; certainly.

"*Q.* And that interest arose by reason of this accident; you were somewhat concerned over his injury?

"*A.* Yes, sir.

"*Q.* Up to that time?

"*A.* Yes, sir."

After an autopsy Dr. Moll said lobular pneumonia was not the cause of the death, that in one lung there was a congestion of a hypostatic character, that "hypostatic pneumonia might have been the result of septicemia," and that "the man died from degeneration and weakening of the heart muscles" and that "he died of degeneration of the heart, a large hypertrophied heart." Dr. O'Neil, who assisted in the autopsy, after telling of what was found, said:

"*Q.* Doctor, if the deceased, prior to the 10th day of November, 1917, was a man in ordinary health and able to perform the usual work of an ordinarily healthy man, and while employed in one of the Detroit factories was shot in the right hand so that the bullet would cut one of the arteries of the wrist, and that after that shot he continued suffering from the result and died on the 6th day of February following, would you be able to state from the conditions found on the

autopsy whether the conditions that you describe were the result of septicemia following the wound in the wrist and hand?

"*A.* It might follow septicemia, yes, if that condition existed there, if that condition existed.

"*Q.* Could septicemia produce the conditions that you described?

"*A.* I think it could."

We are not unmindful of the evidence in the record directly contrary to that above reviewed, but finding such evidence in the record we cannot say that there was before the board no evidence from which it might properly infer that the death resulted from the accident.

The award is affirmed.

MOORE, C. J., and STEERE, BROOKE, FELLOWS, STONE, BIRD, and SHARPE, JJ., concurred.