(No. 21680.—

THE ALLITH-PROUTY COMPANY, Plaintiff in Error, *vs.* THE INDUSTRIAL COMMISSION *et al.*—(MARGARET WARFIELD, Defendant in Error.)

*Opinion filed February 23, 1933—Rehearing denied April 12, 1933.*

JONES, J., dissenting.

ACTON, ACTON & BALDWIN, and REARICK & MEEKS, for plaintiff in error.

FLEMING & HENDERSON, and P. S. DUFFIN, for defendant in error.

Mr. JUSTICE STONE delivered the opinion of the court:

Defendant in error, the widow of William Warfield, deceased, was awarded compensation by the Industrial Commission for injuries resulting in his death. The circuit court of Vermilion county confirmed the award. The cause is here on writ of error.

On hearing before the arbitrator it was stipulated that the deceased and plaintiff in error were operating under and subject to the Workmen's Compensation act. The earnings of deceased were also stipulated, as was his employment by plaintiff in error. The question in dispute was whether the deceased received an accidental injury which arose out of and in the course of his employment. The arbitrator found that the deceased did not sustain such an injury. The Industrial Commission on review, and hearing of further evidence, set aside the finding of the arbitrator and found that on November 25, 1930, the deceased did sustain accidental injuries which arose out of and in the course of his employment, resulting in his death on November 30 following, and entered an award appropriate, under the statute, to such a finding.

The deceased died of lobar pneumonia, and the question is whether such a disease, contracted under the circumstances in evidence in this case, was caused by an accidental injury received during the course of the employment of the deceased.

Plaintiff in error is engaged in the manufacture of malleable iron castings at Danville, Illinois. Deceased was a common laborer employed by the plaintiff in error in the conduct of its business. On November 25, 1930, the de-

ceased was working in the moulding room, where the temperature ranged from 80 to 110 degrees, and in the annealing room, where the temperature ranged from 50 to 90 degrees. The metal from which the malleable castings were made was received at the plant of plaintiff in error in railroad cars, and it was the custom, when the yard foreman was short of help, to call upon the foreman of the moulding room for additional men, who were sent out to assist in the unloading. On the morning of November 24, deceased, with other employees, was sent out to assist in unloading a car of iron. The temperature was about 32 degrees above zero in the yard. Deceased worked at that employment until about 10:30 A. M. He was dressed in cotton underwear, a cotton shirt, denim overalls and jacket, and a raincoat which extended to a point half-way between his hips and knees. About 10:30 he was directed to go to the foundry, where he removed his raincoat, jacket and shirt and worked for about an hour. He perspired freely and the clothing he was wearing became wet. From the foundry he went to the annealing room and dried his clothes. From there he returned to the yard and assisted in unloading iron for about a half hour, when he returned to the plant for his lunch. On the afternoon of that day he worked outdoors for several hours and later worked in the foundry. After the latter employment he went to his home. On the morning of November 25 deceased again worked outside, unloading iron from about 7:00 until 10:30 o'clock. The temperature in the yard at that time was about 20 degrees above zero. At 10:30 he returned to the foundry and performed his usual labor, thereafter going to the annealing room, where he sat on a bench until about 4:30 and then returned to his work in the foundry. He worked there for about thirty minutes but was unable to finish and sat down, holding his head in his hands. On arriving at home that evening he was coughing and was helped to bed. The next day he grew worse and on the second day a

doctor was called. The doctor called again on the third day and on the fourth, during which latter day deceased died of lobar pneumonia.

Dr. W. H. Wilson, who attended him, testified that he knew deceased in his lifetime and saw him at his home the latter part of November, 1930, and that he then had a temperature of 102 and was delirious. The witness diagnosed the complaint as lobar pneumonia. He testified that he saw him again the next day and the third day. His opinion was that the deceased died of lobar pneumonia and not of any other illness. In answer to a hypothetical question setting out the substance of the testimony regarding the acts and occupation of the deceased during November 24 and 25, he stated that he had an opinion as to whether there existed any causal relation between the death of Warfield on November 30 and the conditions under which he had worked. He stated, also, that it was his opinion that the existence of such a causal relation was within a reasonable degree of medical certainty. He testified on cross-examination that he did not mean to say that an injury had occurred to the deceased, for he had had no history of the case.

Dr. C. L. Bennett, in answer to the same hypothetical question, testified that in his opinion deceased had died of pneumonia and that there was a causal relation between the facts stated in the question and the death of the deceased. On cross-examination he testified that he could not point out, in the facts related, when the infection was transmitted to the lungs of the deceased—whether it was during the employment or going between his home and place of work—and that he could fix no time when the lobar pneumonia actually started. He stated that it was his opinion that it is within a reasonable degree of medical certainty that a man working under the conditions of the employment of the deceased was exposed to a greater risk of being injured by the elements than were the public generally,

and that under the statement of facts given him, the conditions of employment of the deceased necessarily accentuated the natural hazards. He stated that by a degree of medical certainty he meant "the best we can ascertain—that is, the best we can guess." He testified on cross-examination that he was unable to trace the infection or incubation of the lobar pneumonia germs to any definite time or place; that he didn't know how much time would be required, under the facts stated in the question, for the disease germs to incubate, and that in isolated cases they have been found to require seven days. This was also, in effect, Dr. Wilson's testimony on that subject. These doctors testified on behalf of defendant in error.

Two medical witnesses, Dr. John G. Fisher and Dr. Donald C. Good, testified on behalf of plaintiff in error on review before the commission. In answer to a similar hypothetical question to those presented to the other doctors they testified that no causal relation between the lobar pneumonia, from which Warfield died, and the conditions under which he worked, could be seen; that his employment did not show a contributing cause any more than other circumstances might do.

The evidence is undisputed that the cause of Warfield's death was lobar pneumonia and that lobar pneumonia is a germ disease. It is necessary to recovery of an award under the Compensation act for death of an employee, that the applicant prove by evidence from which at least the inference can be fairly and reasonably drawn that the deceased received an accidental injury which arose out of and in the course of his employment and which caused his death. (*Chicago and Northwestern Railway Co.* v. *Industrial Com.* 341 Ill. 131; *Standard Oil Co.* v. *Industrial Com.* 339 id. 252; *Edelweiss Gardens* v. *Industrial Com.* 290 id. 459.) There must be an accidental injury as the immediate or proximate cause of the death. (*Hahn* v. *Industrial Com.* 337 Ill. 59; *Chicago and Northwestern*

*Railway Co.* v. *Industrial Com. supra; Jakub* v. *Industrial Com.* 288 Ill. 87.) There is here no evidence that the deceased was suffering from any disease that was aggravated by the conditions under which he worked. So far as the record shows, he prior to the attack of lobar pneumonia was in good health.

It is argued by counsel that the great difference in temperature existing between the foundry and the yard caused a thermal injury to Warfield's lungs which was the cause of lobar pneumonia and that his death was directly caused by that injury. Liability under the Workmen's Compensation act cannot rest upon speculation or conjecture but must be based upon facts established by a preponderance of the evidence. It cannot rest upon a choice between two views equally compatible with the evidence. (*Carson-Payson Co.* v. *Industrial Com.* 340 Ill. 632; *Green* v. *Industrial Com.* 337 id. 514; *Berry* v. *Industrial Com.* 335 id. 374; *Railroad Water Co.* v. *Industrial Com.* 334 id. 52; *Byram* v. *Industrial Com.* 333 id. 152; *Springfield District Coal Co.* v. *Industrial Com.* 300 id. 28; *St. Louis Smelting Co.* v. *Industrial Com.* 298 id. 272.) There is no evidence that there was such an injury or that the conditions under which Warfield worked gave rise to the presence of pneumonococcus germs, or when, during such employment, a so-called thermal injury took place. The record is barren of proof that the deceased received any injury prior to the time when he was seized by lobar pneumonia. While medical witnesses testified that in their opinion there was a causal relation between Warfield's death and the conditions under which he worked, neither of them testified as to what that causal relation was, when it was manifested or when deceased became infected with lobar pneumonia, but, on the other hand, stated that they could not fix the time when he became so infected or injured. Can there, then, be said to be basis for a reasonable inference that the deceased sustained an accidental injury which arose out of

and in the course of his employment or that his occupation involved hazards of infection with lobar pneumonia to which the public generally are not exposed? It is a matter of common knowledge that many people go from a hot room into a cold temperature outside without contracting lobar pneumonia, and that, on the other hand, many are afflicted with lobar pneumonia who do not experience such a change of temperature. The deceased might have acquired pneumonia from one of numerous causes and under numerous conditions or circumstances. It appears in the evidence that the incubation of pneumonococcus germs sometimes requires a few hours—usually between twenty-four and forty-eight hours—but that cases have been noted where such incubation has required as long as seven days. Whether deceased received the pneumonococcus germs while at work or on the way to and from work does not appear. It is clear from reading the testimony of all of the medical witnesses that the time and place of infection in this case cannot be withdrawn from the realm of speculation or conjecture. The inference upon which an award may be based must be a reasonable one, based upon facts established by the evidence fairly tending to prove them. *Peterson & Co.* v. *Industrial Board,* 281 Ill. 326.

Counsel for defendant in error cite *Matthiessen & Hegeler Zinc Co.* v. *Industrial Board,* 284 Ill. 378, *Rissman & Son* v. *Industrial Com.* 323 id. 459, and *Arquin* v. *Industrial Com.* 349 id. 220, as authority for their contention that infection by so-called disease germs is an accidental injury. The first of these cases was of arsenical poisoning, the second a case of typhoid fever infection, and the third epidemic meningitis. In all of these cases the proof showed the presence of the poison or germs in the place and under the conditions of the employment. There is here no proof that pneumonococcus germs were present at the place and under the conditions of Warfield's employment or that the conditions of his employment were conducive to the presence

of such germs. The proof does not show that the deceased received an injury which arose out of and in the course of his employment which caused pneumonia resulting in his death. Therefore the circuit court erred in confirming the award, and its judgment is reversed and the award set aside.

*Judgment reversed and award set aside.*

Mr. JUSTICE JONES, dissenting.