[No. 27763.   Department One.   November 9, 1940.]

ELSIE McLAREN, *Appellant,* v. THE DEPARTMENT OF LABOR AND INDUSTRIES, *Respondent.*[1]

*J. Speed Smith* and *Evans, McLaren & Lane,* for appellant.

*The Attorney General, J. A. Kavaney* and *T. H. Little, Assistants,* for respondent.

ROBINSON, J.—D. E. McLaren died on May 24, 1937. The death certificate gave the cause as lobar pneumonia, with the date of onset as May 17th. For some time preceding the event, the deceased had been regularly employed in a Seattle lumber mill. He left a widow and three small children surviving.

On June 8th, Mrs. McLaren filed a claim with the department for a pension for herself and children, in which the cause of death was alleged to be "a serious blow received at the mill causing pneumonia." On August 9th, the supervisor of industrial insurance entered the following order:

"It is hereby ordered that the claim for pension filed by Elsie McLaren be rejected for the reason that there is no proof of an injury sustained by the deceased D. E. McLaren during the course of employment, nor was death the result of the injury alleged as defined and contemplated by the workmen's compensation act."

An appeal was taken to the joint board. Evidence on behalf of the claimant and on behalf of the department was taken before an examiner. No member of the joint board was present at the hearing. After reviewing the record, the joint board concluded:

"That there is no connection between the death and the alleged injury; that the supervisor's action was correct and should be sustained."

The board did not, in terms, find that the deceased had not suffered an injury, but we infer, from the repeated use of such expressions as "alleged injury" and "allegedly struck" in the recitals of the record leading up to its conclusions, that it was of the opinion that the deceased had not even been injured.

The matter was appealed to the superior court of King county and there heard before a court and jury in September, 1938. The jury found for the claimant. A motion for a new trial or, in the alternative, for judgment notwithstanding the verdict, was interposed. These motions were not brought on for hearing until February, 1939. At that time, leave was given to file written briefs. The last of these was not received by the trial court until March 22nd. On April 10th, the trial judge filed a most carefully prepared and exhaustive opinion in which he arrived at the conclusion that the motion for judgment notwithstanding the verdict should be granted. Subsequently, he entered findings to the effect that the deceased was injured while engaged in extrahazardous employment, but that there was not sufficient proof that he died as a result of that injury, and a judgment of dismissal was entered.

The principal assignment of error on appeal is that the trial court erred in granting judgment notwithstanding the verdict. This will necessitate a review of the evidence, but, before that is undertaken, it will

be necessary to define the principles which must govern us in passing upon the assignment.

■ Under existing law, the primary inquiry would be,—Was there any evidence to support the verdict?—for verdicts rendered in such cases as this, now have the same force and effect as in actions in law. *Alfredson v. Department of Labor & Industries,* 5 Wn. (2d) 648, 105 P. (2d) 37. Unfortunately for the appellant, chapter 184, Laws of 1939, p. 579 (Rem. Rev. Stat. (Sup.), §. 7697-2 [P. C. § 3488-21]), so providing, did not become effective until midnight of June 7, 1939. At the time the trial court ruled upon the motion for judgment notwithstanding the verdict, the verdict was merely advisory, and it would have been error to treat it as mandatory and binding. *Hodgen v. Department of Labor & Industries,* 194 Wash. 541, 78 P. (2d) 949.

Obviously, one who sees and hears a witness testify has a better opportunity to determine the weight to be given his testimony than one who merely reads a transcript of it. Because of this fact, it is a universal rule that appellate courts, in reviewing the findings of inferior courts upon a written record, will not readily set such findings aside, if the inferior tribunal saw and heard the witnesses. This rule has no application in the instant case. Neither the joint board nor the trial judge saw or heard the witnesses. They merely read a transcript of the testimony, and were in no better position to judge of its weight than we are.

■ However, it does not follow from this that there is no presumption in the instant case in favor of the findings of the joint board. Rem. Rev. Stat., § 7697 [P. C. § 3488], provides, in part, as follows:

"In all court proceedings under or pursuant to this act [workmen's compensation act] the decision of the department shall be prima facie correct and the burden of proof shall be upon the party attacking the same. . . . "

The appellant states that this provision first came into the act in 1927, when the law required hearings to be held before the board or some member thereof, and that the laws of 1929 provided for the first time that hearings might be held before an examiner, and it is argued:

"It is extremely doubtful whether the legislature intended this presumption to extend to this new departure in procedure by which board members may merely read the transcript of the testimony."

We reject this theory. The provision remains as an integral part of the compensation act and must be given such effect as its language warrants.

It is said in the memorandum opinion of the trial court that none of the decisions of this court has definitely stated the character of the presumptive effect of the decisions of the department when the evidence is taken before an examiner and merely read by the joint board. The presumptive effect in such circumstances must be determined from a construction of the statute above quoted:

"The decision of the department shall be prima facie correct and the burden of proof shall be upon the party attacking the same. . . ."

This language is simple and direct. It means that, if, in the opinion of the reviewing court, the evidence as to a factual issue is evenly balanced, the finding of the department as to that issue must stand; but, if the evidence produced by the party attacking the finding preponderates in any degree, then the finding should be set aside. In *Ivey v. Department of Labor & Industries,* 4 Wn. (2d) 162, 102 P. (2d) 683, a case decided since the trial judge rendered his memorandum opinion, we said, in construing the statute above quoted:

"They [the appellate courts] must accept the determination of the department as *prima facie* correct, and only to be set aside if the burden of proof has been met by the party attacking it; . . ."

We pass now to a consideration of the evidence. As a basis for its conclusion, the joint board reviewed the evidence in its "Summary of Record and Proceedings." The first paragraph of this review reads as follows:

"Subsequent to the Joint Board's order of September 20, 1937 a hearing was had at which time Odal Vicklund, called as a witness on the petitioner's behalf, testified that he had known Mr. McLaren at the Seattle Cedar Lumber Company's mill; that they worked together; that on an unremembered day in late April, 1936 the witness saw a board fall off a hook of the piling machine, the board being about 1″ x 10″ by 10 feet, and striking the claimant on his left side as he stooped over to pick up a stick, the board hitting him about the second or third rib from below on the left side; that the claimant straightened up, made a sort of face, probably missed putting on a board on to the next three or four hooks, but continued to feed the piling machine thereafter for ten or fifteen minutes until quitting time."

To this should be added that Vicklund testified that two or three days after the accident McLaren told him that, although he had not consulted a doctor, the injury which he received from the falling board had bothered him and was getting worse. The joint board summarized the testimony given by Mrs. McLaren, as follows:

"Thereafter the petitioner, called as a witness on her own behalf, testified that she was in Hillsboro, Oregon, in early April, 1937, returning to Seattle about April 25, 1937; that upon her return her husband, the claimant, stated he had been hit on the side in the mill, the claimant indicating the left side about the lower two or three ribs; that he had a little lump there about the size of a man's thumb nail which looked as if the skin had been knocked off; it was scratched a little bit

and discolored; that he was coughing up blood; that he continued thereafter to cough frequently and so violently that it would be necessary for him to hang on some piece of furniture to steady himself; that this spitting, which included spitting up of blood, continued right up until the time he went to the hospital and he appeared to be getting constantly worse from the date of her return until his death. That at the time of his injury he stated he thought he had broken a rib."

This includes all the material points in Mrs. McLaren's testimony, except that she testified that, during that period, Mr. McLaren could not sleep on his left side on account of the pain. The summary continues:

"Carl Hyppa, called as a witness on the petitioner's behalf, testified that he had worked with the claimant; that about April, 1937 the claimant complained of pain in his left side and made comment of being hit by a board; that the claimant made complaints several times in succession but that he made no complaints for about a week prior to the time the witness left the employ of the company on May 7th. The witness further stated that the claimant was at no time spitting up blood and that further he continued on with his work doing the same kind of work as before his alleged injury."

We quote the following from the testimony of Hyppa:

"I left there the 7th of May and he made the complaint to me about pain several days prior to the time I left there."

The statement in the summary that "the witness further stated that the claimant was at no time spitting up blood, etc.," is misleading. The witness merely testified that he did not see McLaren spit up blood, which is wholly negative testimony. The summary continues:

"Doctor H. T. Buckner, called as a witness on the petitioner's behalf, testified in answer to a hypothetical

question that in his opinion there *might be* a causal relationship between the death and the history of injury as given to him, in that traumatic pneumonia could follow such an injury and the onset might have been delayed as long as it was in this case for the reason he understood there had been continuous spitting of blood from the date of the alleged injury until the claimant's death. He admitted in practically all cases of traumatic pneumonia the onset was sudden and usually came on within a day or two after the accident." (Italics ours.)

This paragraph of the summary is not, in our opinion, a fair or accurate account of the testimony of Dr. Buckner. A long hypothetical question was put to Dr. Buckner covering the evidence relating to the injury, the condition of the deceased thereafter, and the time and manner of his death. No objection of any kind was made to its recitals of evidence or to its content. It ended with the following:

"State whether or not in your opinion the injury described was a contributing cause to the pneumonia."

Doctor Buckner answered that he would say that there was "a definite causal relation." Nor did he admit that, in "practically all" cases of traumatic pneumonia, the onset was sudden and usually came on within a day or two after the accident. The department's examiner attempted to have him do so, but, as we read the record, the attempt was unsuccessful. Upon cross-examination by the examiner for the department, Dr. Buckner testified, in part, as follows:

"Q. Doctor, the onset of pneumonia is usually sudden isn't it? A. As a rule in the majority of cases—it has a sudden onset. Q. Is a traumatic pneumonia insidious or sudden in its onset? A. I had a man injured Sunday and he has pneumonia in his chest today. Q. This is Tuesday? A. Yes. Q. That is usually the history of pneumonia of the lung? A. No; I have seen them when they developed in anywhere

from one to five or six weeks from chest injuries. Q. What kind of accident was it which developed the pneumonia? A. Injuries to the chest where they had bruises; some were rib injuries, and some had bloody sputum, but no demonstrable ribs fractured, which you say [see?] in the X-ray."

The summary recites:

"Doctor Guthrie, called as a witness on the petitioner's behalf, testified from hypothetical question substantially as had Doctor Buckner. He added further that he did not recall ever having had any case of traumatic pneumonia in his practice."

We note, however, that the witness produced and read from a medical treatise to sustain his answer, and stoutly contended that, according to the authorities, traumatic pneumonia might manifest itself as long as several weeks or two or three months after the injury. He further stated that, in a delayed case, an autopsy after death would not necessarily reveal the original injury.

Two workmen, other than Vicklund, testified that they saw the deceased occasionally during the latter part of April and the early part of May, and that he told them of the board falling upon him and complained of pains in his left side. Neither of them, however, saw him spit blood.

The department called Dr. Garhart as a witness. He had made an X-ray examination of the body of the deceased. He found no external evidence of injury, and the X rays revealed no broken ribs or injury to the bony structure of the chest. They did show a double, massive lobar pneumonia involving both left and right lungs, which had become consolidated and thickened. As to the injury to the soft tissues, he said:

"They would not show unless there had been an injury sufficient to cause, for instance, a thickening of the diaphragm; . . ."

Dr. W. E. McClain was called as a witness for the department. He was the attending physician and had certified that the deceased died of lobar pneumonia. When he was first called on May 20th, he found Mc-Laren very ill with lobar pneumonia of the left lung. He saw no evidence of external injury. He did not take the patient's history beyond his condition of the previous day, and he was not told that he had received an injury. Two days after his first call, the right lung was also affected. It is said in the board's summary:

"That the witness was of the opinion that the claimant's death was due solely to the disease of acute lobar pneumonia and not to any injury or to the effects of any injury three weeks earlier . . ."

This statement is, in our opinion, very much stronger than the evidence warrants. It is true that the witness was asked if, assuming there was no evidence of injury to the bones of the left chest wall and no visible external injury to the left side and that the post mortem report revealed no injury to the soft tissues, whether McLaren's death was due solely to lobar pneumonia or whether his death was caused, or in any way contributed to, by an injury alleged to have been received by him three or four weeks earlier when, it was claimed, he was struck by a piece of timber.

"A. It is my judgment of lobar pneumonia. Q. In your opinion was his death in any way due to the purported injury of three weeks earlier? A. According to the reports, why, we have to judge that the injury did not have anything to do with it.

"Cross-Examination by Mr. Smith: Q. You just said 'According to the reports the injury had nothing to do with it.' Do you know anything about the injury he received, doctor? A. No; I don't know anything about it. Q. Do you want to state into the record, not knowing what the injury was, when it was or the nature of it, it had nothing to do with the man's death? A. According to the findings on this report. Q. All

you are saying now, and all you can say, is that the findings as to the injury causing it, are merely negative; is that right? A. That is right. Q. So you don't mean to say you have any opinion that the injury did not enter into the cause of the pneumonia of this man, do you? A. I don't know anything about the injury. Q. That is it, and therefore, you cannot say? A. No, I cannot. Q. If it had anything to do with it? A. No; other than the reports. Q. It maybe that this man did suffer an injury which you know nothing about? A. He might have. Q. Such could have made a very fertile field for pneumonia; is that true? A. If he received an injury it might lead to some weakness. . . . Q. And you cannot say that an injury did not have anything to do with it? A. No; I could not say that. Q. As a matter of fact, if the man received an injury to the tissue of the lung and it is followed—it can be and is followed by pneumonia, now, when the pneumonia sets in the inflamation from that disease becomes general thruout the lung in that part which is affected; and that inflamation or consolidation would obliterate anything there prior to that and you would not be able to detect it on postmortem? A. The affected part would be obliterated, and I could not tell it by my examination. It might be there but I could not see it. Q. Let us go back and question you about the history. When you were called in to see the young man he was in a most serious and painful condition, wasn't he? A. He was. . . . Q. You were not interested as to whether he was injured the week before, the striking with a plank several weeks before; a condition was there and you had to meet it immediately? A. That is true. Q. Wasn't he in great pain? A. He was in pain. Q. And was he saying anything except when you asked questions? A. No; he wasn't talking. Q. So you didn't approach the case with the idea of trying to find out what caused the pneumonia; you weren't interested in that? A. No."

On re-direct examination, he was asked whether the facts would indicate that there was any relation or

connection between the injury and the subsequent death of McLaren by lobar pneumonia.

"A. Well, I can say it is possible for him to have had an injury, but to me it does not look reasonable that he would have this over the period of time before the pneumonia set in; it is possible but does not look reasonable."

Upon re-cross-examination, he testified as follows:

"Q. A man may receive from an injury damage to the lining of his lung or lung tissue; that is right? A. He can. Q. And following that he may spit bloody sputum from there; is that true? A. If the injury communicates with the bronchial tube. Q. If there is injury to the lung tissue it is likely to do that? A. Yes; depending on the kind of injury. Q. A man can receive by injury to the ribs a damage to the lung tissue; is that right? A. Yes. Q. And that damage to the lung tissue may result in his spitting bloody sputum? A. Possibly. Q. And that may continue over a period of weeks, may it not? A. It might. Q. And during that period it is possible a man may have in his lungs or throat and elsewhere pneumonia germs? They may be present in any man? A. That is true. Q. If it is true he had this injury to the lung tissue, as I suggest, and he continued to spit blood for a period of three weeks, it could also happen that his resistance to those germs—they could be pneumonia germs in there, but he had enough resistance for three or four weeks to throw them off—those germs; isn't that possible? A. Yes; possibly. Q. And then the infection would take hold? A. It is possible. Q. And he would have pneumonia? A. Yes. Q. Wouldn't you say in that case—if it did happen—that his pneumonia was due to the damage or injury to the lung tissue? A. That would be the beginning of it."

M. A. Obermarck, who had charge of issuing the pay checks at the mill, testified that Mrs. McLaren called for her husband's pay check a day or two before he died and that she told him that he was then in the hospital with pneumonia, but said nothing about a

previous injury, and no report of the injury to Mc-Laren was received by his foreman or by the mill.

The joint board summarizes the evidence given by Dr. Nickson, the last witness called, as follows:

"Doctor D. H. Nickson, called as a witness on the Department's behalf, testified that at the request of the widow's attorneys he had performed a post mortem examination of the body of the claimant; that he found no external evidence of any injury; found no evidence of hematoma in the tissues; that examination disclosed both lungs equally involved in the progress of the disease of lobar pneumonia; that there was no evidence from examination of the tissues of the lungs of any injury; that the lobar pneumonia of which the claimant died was the type which developed rapidly within from three to five days."

The witness testified to much more than that. He was examined and cross-examined at great length. He said that it was possible for a person to receive a blow on the ribs which would injure the lung tissue, and that he might, after several weeks, develop pneumonia in the lung which was injured.

"Q. With the evidence in the given case that the beginning of the pneumonia was in the area and first developed at the point where the injury had been received, would not that lend considerable credence to the theory that the blow was a contributing cause of the pneumonia? A. If those circumstances were true it would; yes. Q. The condition of the lung tissue at the time you made this postmortem had communicated certain changes due to the disease—hadn't it? A. Yes. Q. It was all in a red, inflamed condition? A. Right. Q. Wouldn't that condition due to disease tend to cover an injury to the lung tissue, unless the injury had been sufficiently great and of a sufficient length of time to form some scar tissue? A. A small injury would be covered up; yes."

Before leaving the stand however, the witness said:

"It is a little hard for me to appreciate an injury to

that lung which was sufficient to cause hemorrhage over a period of some weeks, and not have it leave enough evidence in the lung to have it found. . . . It is conceivable, but, I think, rather improbable."

On final re-direct examination, the attorney representing the department asked the witness:

"Doctor, a person can't have an injury to the lung from a board falling on him over the ribs without his fracturing the ribs? A. I will have to answer that by saying, in my experience I have never seen such an injury; the books say they do occur."

It was then developed that the witness was a specialist in pathology and had but little experience in the field of injuries; and with this, the hearing came to a close.

In this case, it has been admitted, at all times and by all parties, that the direct cause of death was lobar pneumonia. The trial court found that the deceased, while at work during the latter part of April, was struck by a falling board. We concur in that finding. It appears, from undisputed and unimpeached evidence, that the board was about ten feet long, ten inches wide, and one inch thick, and that it fell from a height of ten feet and struck the deceased on the left side at about the third rib, while he was in a stooping position.

The only question remaining for solution is this: Was there a causal connection between this accident and the pneumonia?

The appellant seeks to bring the case within that of *Anderson v. Industrial Ins. Commission,* 116 Wash. 421, 199 Pac. 747, in which the rejection of a claim by the commission was reversed upon appeal. Although there is a wide difference in facts, there are close analogies between that case and the instant case. In the *Anderson* case, as in this, the direct cause of death was

lobar pneumonia. In that case, as in this, it was contended that the deceased contracted pneumonia because of his weakened condition, due to a previous injury. In that case, it was an injury to the deceased's foot. In this case, the injury (accepting the evidence that the deceased spit blood) was directly to the left lung, in which lung the pneumonia first developed. In both cases, it was manifestly impossible to prove causal connection beyond doubt. Speaking of the testimony given by the medical men in the *Anderson* case, the court said:

"All of them testify moreover, that it was not beyond probability that he acquired pneumonia from his exposure to the weather because of his weakened condition, and some of them testify that it was highly probable that he did do so."

In this case, there was a wider divergence of opinion. All of the medical witnesses testified that causal connection was "possible," and some of them (two of the four) went beyond testifying that it was "highly probable," and gave it as their fixed opinion that the injury induced the attack of pneumonia. If their testimony is accepted, the finding of the trial court must be reversed, for, as said of the foot injury in the *Anderson* opinion:

"It is sufficient if it was the proximate cause—the cause which directly set in motion the train of events which brought about the death."

A number of pneumonia cases are cited from other jurisdictions. It would be impossible to discuss them in this opinion, and, perhaps, unprofitable, since the statutes involved are different and the facts vary. The appellant cites, among others: *Armstrong v. West Coast Life Ins. Co.*, 41 Utah 112, 124 Pac. 518; *Tanner v. Aluminum Castings Co.*, 210 Mich. 366, 178 N. W. 69; *Murdock v. New York News Bureau*, 263 Pa.

502, 106 Atl. 788; *Beishline v. Pardee Bros. & Co.*, 114 Pa. Super. Ct. 71, 173 Atl. 700; *Robertson v. State Industrial Accident Commission,* 114 Ore. 394, 235 Pac. 684; *Waite v. Fisher Body Corp.,* 225 Mich. 161, 196 N. W. 189; *January-Wood Co. v. Bramel,* 252 Ky. 258, 67 S. W. (2d) 14; *Armour & Co. v. Industrial Board,* 273 Ill. 590, 113 N. E. 138; *Kivish v. Industrial Commission,* 312 Ill. 311, 143 N. E. 860; *Hendershot v. Lincoln,* 136 Neb. 606, 286 N. W. 909. See, also, notes, 20 A. L. R. 66; 73 A. L. R. 539.

In some of the foregoing cases, the injury had no direct relation to the chest cavity, and, in some, the deaths occurred a long time after the injury. In *Waite v. Fisher Body Corp.,* for example, the employee was injured by an iron bar falling on his little toe on January 10th. He died of pneumonia on March 6th, and in *Beishline v. Pardee Bros. & Co.,* the death occurred sixty weeks after the injury.

The respondent cites a great number of cases, and places especial dependence upon the following: *Anderson v. Baxter,* 285 Pa. 443, 132 Atl. 358; *Sears, Roebuck & Co. v. Industrial Commission,* 334 Ill. 246, 165 N. E. 689; *Aetna Casualty & Surety Co. v. Sparrow,* 122 S. W. (2d) (Tex. Civ. App.) 286; *Texas Employers' Ins. Ass'n v. Burnett,* 105 S. W. (2d) (Tex. Com. App.) 200; *Galluzzo v. State,* 111 Conn. 188, 149 Atl. 778; *Springfield Dist. Coal Mining Co. v. Industrial Commission,* 303 Ill. 455, 135 N. E. 789; *Allith-Prouty Co. v. Industrial Commission,* 352 Ill. 78, 185 N. E. 267; *Townsend v. Loeffelbein,* 123 Neb. 791, 244 N. W. 418; *Morgan v. Philadelphia & Reading Coal & Iron Co.,* 273 Pa. 255, 116 Atl. 891; *Newkirk v. Golden Cycle Mining & Reduction Co.,* 79 Colo. 298, 244 Pac. 1019; *Hoag v. Kansas Independent Laundry Co.,* 113 Kan. 513, 215 Pac. 295.

Some of these cases reject the lowered vitality the-

ory which was made the basis of this court's decision in *Anderson v. Industrial Ins. Commission,* 116 Wash. 421, 199 Pac. 747.

The trial judge felt that the evidence in this case did not remove the question, as to whether or not there was causal relation between the injury and the pneumonia, from the realm of speculation. In coming to his decision, he relied upon certain generalizations concerning the burden of proof made in the case of *Hoff v. Department of Labor & Industries,* 198 Wash. 257, 88 P. (2d) 419. It appears also that he was greatly influenced by a quotation appearing in another of our opinions. It is said in his memorandum decision:

"Moreover, in the case of *Hessler v. Moore,* 188 Wash. 80, a pneumonia case, the supreme court, in holding that there was not therein sufficient evidence to show a causal connection between the exposure and the cold, if any, and the death of Hessler, quoted from the case of *Hill v. Great Northern Life Ins. Co.,* 186 Wash. 167, the following:

" 'It is undoubtedly true that, in determining the cause of a death for which recovery is sought, the jury may not speculate or conjecture as between several causes. That is to say, where the evidence goes no further than to show that death may have resulted from one of several causes, for one or more of which there is liability, and for another or others of which there is none, then the jury cannot speculate or conjecture and return a verdict as for a cause for which there is liability.' *Hill v. Great Northern Life Ins. Co.,* 186 Wash. 167, 57 P. (2d) 405."

But it should be noted that the court, with the apparent purpose of warning against a too literal application of its quotation from the *Hill* case, immediately went on to say:

"The language just quoted may be supplemented by the following:

" 'A plaintiff in this character of case is not obligated to establish the material facts essential to a recovery

beyond a reasonable doubt. Such a rule would amount to a denial of justice. It is sufficient if his evidence affords room for men of reasonable minds to conclude that there is a greater probability that the accident causing the injury happened in such a way as to fix liability upon the person charged with such liability, than it is that it happened in a way for which the person so charged would not be liable.' *St. Germain v. Potlatch Lumber Co.*, 76 Wash. 102, 135 Pac. 804.

"These two extracts read together seem to fairly state the law on this question."

As indicated in Shepard's Washington Citations, the *St. Germain* case has been repeatedly cited with approval. It has also been frequently quoted where the question of speculation is involved. A recent example, and one in which it was made the rule of decision, is *Thomas v. Inland Motor Freight*, 190 Wash. 428, 438, 68 P. (2d) 603; opinion on second appeal, 195 Wash. 633, 81 P. (2d) 818.

After quoting from the *St. Germain* opinion in *Lee v. Gleason Co.*, 146 Wash. 66, 262 Pac. 133, the court said:

"If there is a greater probability that the death was the result of the accident rather than of any other cause, then the verdict does not rest upon speculation or conjecture. In *Frescoln v. Puget Sound Traction, L. & P. Co.*, 90 Wash. 59, 155 Pac. 395, it is said:

" 'The cause of an accident may be said to be speculative when, from a consideration of all the facts, it is as likely that it happened from one cause as another. As soon as the balance of possibilities is broken, the jury is put to the burden of weighing the evidence.' "

We are of the opinion that the evidence in the record renders it more probable than not that there was a causal relation between the injury suffered by the deceased and his death. We are not unmindful of the fact that, in arriving at this conclusion, we must give credence to the testimony of Mrs. McLaren regarding

the spitting of blood, since that the deceased occasionally spit blood in the interval between his injury and the onset of the pneumonia was assumed to be true in the hypothetical question put to Drs. Buckner and Guthrie.

Nor are we unmindful of the fact that Mrs. McLaren was the sole witness as to the spitting of blood, and, also, a vitally interested witness. Interest affects the weight of testimony, but it does not *ipso facto* wholly destroy its probative value.

"No person offered as a witness shall be excluded from giving evidence by reason of his interest in the event of the action, as a party thereto or otherwise, but such interest may be shown to affect his credibility: . . ." Rem. Rev. Stat., § 1211 [P. C. § 7722].

It must be remembered that Mrs. McLaren's testimony was not subject to any discount by the joint board or by the trial judge on account of her appearance on the witness stand or of her demeanor while giving it. In evaluating her testimony, they had before them merely the typewritten record. We are in the same position, and, after a painstaking examination of the transcript, we are of the opinion that her direct evidence as to this narrow issue preponderated over the wholly negative evidence introduced on behalf of the department.

The judgment appealed from is reversed, and the cause remanded to the trial court for further proceedings not inconsistent herewith.

BLAKE, C. J., MAIN, and SIMPSON, JJ., concur.

MILLARD, J. (dissenting)—The burden of proof is upon the party attacking the decision of the department, which decision, under the statute (Rem. Rev. Stat., § 7697 [P. C. § 3488]), shall be *prima facie* correct. A careful examination of all of the evidence in

this record convinces me that the appellant failed to sustain the burden of proof imposed upon her by the statute. No physician testified that, in his professional opinion, the death of appellant's husband resulted from the alleged injury to his side. There is no evidence, nor is there any evidence from which it may be legitimately inferred, that the death of appellant's husband was due to the injury.

Appellant's husband was struck in the left lower side by a board April 17, 1937. Appellant was not then at home. She did not return to her home until April 20, 1937. She stated that her husband then told her about the accident and showed her his side. He continued to work until May 18, 1937, one day more than a month after the injury. When he came home from work, according to appellant, the evening of May 18, 1937, "he seemed all right." That night, he became ill and his temperature mounted. The next day, he complained that his side hurt him when he coughed or when he tried to lie on his left side. He had not improved the morning of May 19, 1937, when a physician was called, who informed her that her husband was suffering from pneumonia and advised that he be taken to a hospital, which was done. Four days thereafter, May 24, 1937, McLaren died.

No report was ever made to his employer of his injury, nor did McLaren give to his attending physician the history of any injury. Dr. Nickson, who was retained by the claimant, stated to an investigator of the department that he could not give a written statement of his opinion as to the cause of death. When the investigator questioned him, however, the physician stated that, at the post mortem, he found no indications that lobar pneumonia was brought about by trauma, and that he so informed claimant's counsel. The physician further stated that, in view of the multiple

fibrinous adhesions between the pleura and over the entire surface of both lungs, he felt that this was not the first time McLaren had suffered from pneumonia.

The attending physician would not testify that the death from lobar pneumonia was a result of the injury. The testimony of the physicians goes no farther than that, based upon the assertion of the claimant that her husband had been spitting blood subsequent to the injury and on the assumption that the spitting of blood was the result of the alleged injury, *it was possible* that the death of McLaren resulted from the injury. It is presumed that, if it be true that deceased was spitting blood after the injury, *possibly,* presuming that the spitting of blood was the result of the alleged injury, the death of McLaren resulted from the injury. Such a chain of presumptions does not satisfy the statute.

By the *showing* of *a mere possibility* that the injury caused or contributed to the death of McLaren, the appellant did not sustain the burden of proof imposed upon her by the statute. Rem. Rev. Stat., § 7697.

If the deceased was injured, he ceased working only a few minutes and then continued for more than twenty days at his employment without making any claim that he had been injured. If the injury had been such as claimed, surely the deceased would have made a report to his employer of the injury. The claimant did not show by a preponderance of the evidence that the injury was a proximate or a contributing cause of the death of her husband.

The following language in the dissenting opinion, which later became the prevailing opinion, in *Ferguson v. Department of Labor & Industries,* 197 Wash. 524, 532, 85 P. (2d) 1072, 90 P. (2d) 280, with respect to the burden of proof imposed by the statute (Rem. Rev. Stat., § 7697) upon the party attacking the decision of the department, which decision, under the

statute, shall be *prima facie* correct, is as apt in the case at bar as in the opinion cited:

"The record in this case, as I view it, demonstrates the wisdom and need for just such a statutory rule and illustrates the propriety of sustaining the decision of the department and the judgment of the trial court."

We have no right to indulge in conjecture. To hold that the judgment should be reversed, would be to enter the realm of speculation. Not only has the claimant failed to establish by a preponderance of the evidence that her husband came to his death as a result of an accident April 17, 1937, but the evidence before us is clear that there was no such disturbance of the pleura as would be likely to cause pneumonia as the result of an injury.

To cite and quote from the numerous opinions of this court sustaining the trial court, would unnecessarily lengthen this dissenting opinion. *Anderson v. Industrial Ins. Commission,* 116 Wash. 421, 199 Pac. 747, is distinguishable on the facts from the case at bar.

The judgment should be affirmed.